19 A.3d 304 (2011)
In re J.F., Appellant.
No. 08-FS-1644.
District of Columbia Court of Appeals.
Argued March 10, 2011.
Decided May 12, 2011.
*305 Christopher Kemmit, Public Defender Service, with whom James Klein and Samia Fam were on the brief, for appellant.
Sidney R. Bixler, Assistant Attorney General, District of Columbia, with whom Peter Nickles, Attorney General at the time the brief was filed, and Todd Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.
Before WASHINGTON, Chief Judge, REID,[*] Associate Judge, Retired, and WAGNER, Senior Judge.
REID, Associate Judge:
Following a bench trial, J.F. was convicted of one count of possession of cocaine, *306 in violation of D.C.Code § 48-904.01(d) (2009 Repl.). He challenges the trial court's denial of his motion to suppress evidence. We reverse the judgment of the trial court.

FACTUAL SUMMARY
The record shows that the trial court heard testimony from the government's witness, Metropolitan Police Department ("MPD") Officer Derek Starliper, and the defense witness, Steven Hughes, regarding J.F.'s motion to suppress evidence. Officer Starliper testified that on May 20, 2008, he was driving his police vehicle and conducting an ongoing investigation near the 5300 block of Clay Terrace, in the Northeast quadrant of the District of Columbia, with Officer William Rankins; the area was known for "illicit narcotics sales and violent crime." At approximately eight o'clock in the evening, the officers "pulled up next to" J.F., in an unmarked police vehicle; J.F. was sixteen-years-old at that time. Officer Starliper had had "a lot of direct contact with residents" in the area, and he "knew that [he] had not had contact with [J.F.] in the past and wanted to ID him." Officer Starliper "asked [J.F.] if he heard any gunshots in the area."[1] J.F., who was walking with his friend Mr. Hughes at the time,[2] responded that he had not. At that point, the officers, who were wearing plain clothes, but had on police vests, badges, and carried visible guns at their waistbands, got out of their vehicle. Officer Starliper approached J.F., who stopped walking, and Officer Rankins went over to Mr. Hughes. On cross-examination, defense counsel inquired: "When you [first] saw my client, he had his hands in his pockets, right?" When Officer Starliper responded in the affirmative, defense counsel stated: "So you told [J.F.] to take his hands out of his pockets ... [and] [y]ou ordered him to do that, right?" Officer Starliper replied: "Yes." J.F. complied with the order to remove his hands from his pockets.
While "standing ... face to face" with J.F., Officer Starliper asked him "general questions, if he lived in the area[, his name, address, date of birth,] and what his purpose was for being there." He posed these questions "[j]ust to get an idea of whether or not [J.F.] had family that may live in the area or just to gage if he was there for ... a lawful purpose." The only people in the area at the time were the officers, J.F. and Mr. Hughes. J.F. was "cooperative" and complied with the officer's requests. Neither Officer Starliper nor Officer Rankins tried to block or restrain J.F. or Mr. Hughes.
During the conversation with J.F., Officer Starliper observed that J.F. was "frequently looking down at his pockets and he started to breathe a little bit heavier than when [the officers] had first made contact." Officer Starliper "could see [J.F.'s] chest moving in and out." Given J.F.'s behavior, Officer Starliper "asked [whether] he had any contraband on him that [the officers] should know about." J.F. stated that he did not. Officer Starliper inquired whether J.F. "didn't mind if [the officers] searched him." J.F. told him to "[g]o ahead." Officer Starliper recovered from J.F.'s "right coin pocket ... a plastic bag that contained a loose rock-like substance." He removed from J.F.'s "left pocket ... another plastic bag that contained a white rock-like substance." J.F. was placed under arrest. Officer Starliper stated that *307 the entire encounter prior to the search lasted approximately three minutes. At no point did J.F. attempt to leave.
Mr. Hughes's testimony on the suppression motion was as follows. He and J.F. had been friends for about three or four years at the time of their encounter with the police on the evening of May 20, 2008. Mr. Hughes, who is a construction worker, met J.F. that evening so that J.F. could show him where a contractor lived. As they were walking toward the contractor's home, they were "stopped by an unmarked police car" carrying two police officers.
The officer in the driver's seat asked if they had heard any gunshots. Mr. Hughes said "no." The officers exited their vehicle; they had on police vests with a police badge, and their weapons were visible. An officer told J.F. "to remove his hands out of [his] pocket." An officer approached Mr. Hughes, grabbed his jacket, and asked to search him. He told the officer to "go ahead." After the search yielded no contraband, the officer "sat [him] on the curb ... until [his] information came back saying that [his] name [was] clear of any warrants or anything else."
Mr. Hughes continued to recount what he saw and heard with respect to J.F.'s encounter with the police when he was seated on the curb. After the police officer told J.F. to remove his hands from his pocket, he asked whether he could search J.F. Mr. Hughes "heard no."[3] However, the officer "frisked [J.F.'s] jacket and continued proceeding to search him." Mr. Hughes thought the officer "went into one of [J.F.'s] pants pockets and pulled out a bag, ... a plastic bag." Mr. Hughes was facing J.F., seated "about a foot or two feet away" when the officer searched J.F. The officer asked J.F.: "Why did you lie to me, something on that order." After requesting a transport car, the officers put [J.F.] in the back of the unmarked police car, and told Mr. Hughes he was "free to go."
In order to read pertinent cases, the trial judge delayed her ruling on the suppression motion. The following day, the trial court denied J.F.'s motion to suppress the evidence. The court did not make detailed factual findings regarding the chronology of the events, but the judge determined that Officer Starliper's testimony was more credible than Mr. Hughes's testimony. The court credited Officer Starliper's testimony that, based on J.F.'s cooperation, there would have been no need for him to swipe J.F.'s waist prior to searching him. In addition, the trial judge relied on United States v. Barnes, 496 A.2d 1040 (D.C.1985) in concluding that the officer's request that J.F. remove his hands from his pocket "was no more intrusive than a request for identification followed by questions and appellee's volunteer[ed] answers." Further, the court stated that it did not find "the overall factors so intimidating as to have been a stop or a seizure." Rather, the court believed "it was a mere encounter." Following trial testimony on September 17, 2008, the court acquitted J.F. of possession with intent to distribute cocaine but convicted him of simple possession. He was sentenced to one day of probation on November 12, 2008, following treatment in the drug program.

ANALYSIS
J.F. argues that he was seized in violation of the Fourth Amendment when *308 Officer Starliper ordered him to remove his hands from his pockets because, under the circumstances, a reasonable person would not have felt free to ignore the officer's request. The government took the position at trial that the officers did not have reasonable articulable suspicion to justify stopping J.F. and that what happened constituted "a mere encounter." J.F. further contends, relying on Florida v. Royer, 460 U.S. 491, 508, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), that since he was seized in violation of the Fourth Amendment, any subsequent consent to a search was "tainted by the illegality and was ineffective to justify the search."
"Whether a seizure has occurred for Fourth Amendment purposes is a question of law which this court reviews de novo, deferring to the trial court's factual findings, unless clearly erroneous." Jackson v. United States, 805 A.2d 979, 986 (D.C.2002) (citing In re J.M., 619 A.2d 497, 500 (D.C.1992) (en banc) (other citation omitted)). However, the issue of whether a citizen has voluntarily consented to a search is a question of fact, thus "[w]e are `bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous.'" Id. (quoting In re J.M., 619 A.2d at 500) (other citations omitted). "Consent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact `sufficiently an act of free will to purge the primary taint' of the unlawful seizure." Hicks v. United States, 705 A.2d 636, 641 (D.C.1997) (quoting McGann v. Northeast Illinois Reg'l Commuter R.R. Corp., 8 F.3d 1174, 1184 (7th Cir.1993) (internal quotation marks and other citation omitted)); see also Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "The purported consent is free of the unlawful taint if there is a break in the causal connection between the illegality and the consent given." Id. But, "[w]hen statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." Id. (citing Florida v. Bostick, 501 U.S. 429, 433-35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), Royer, supra, 460 U.S. at 507-08, 103 S.Ct. 1319 (1983), United States v. McCraw, 920 F.2d 224, 230 (4th Cir.1990)).
"The `crucial test' for determining whether a person has been seized `is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" In re J.M., 619 A.2d at 499-500 (internal quotation marks omitted) (quoting Bostick, supra, 501 U.S. at 436, 111 S.Ct. 2382; California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). Examples of circumstances that might indicate a seizure include:
the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.
United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); see also Kelly v. United States, 580 A.2d 1282, 1286 (D.C.1990). "These factors must be considered as a whole, under the totality of the circumstances, rather than in isolation." Jackson, 805 A.2d at 987 (citing Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870); Kelly, 580 A.2d at 1285.
The Supreme Court has stated, that "not all personal intercourse between *309 policemen and citizens involves `seizures' of persons." Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Furthermore, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Bostick, 501 U.S. at 434, 111 S.Ct. 2382, 115 L.Ed.2d 389; see also Jacobs v. United States, 981 A.2d 579, 583-84 (D.C.2009) (approaching driver's side and requesting that driver roll down window was not a seizure). "[T]he police also may ask a person to do something, such as produce identification or an airline ticket ... without necessarily converting the encounter into a seizure." Barnes, supra, 496 A.2d at 1044 (citing Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870; Royer, 460 U.S. at 491, 103 S.Ct. 1319). It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that] we may conclude that a `seizure' has occurred." Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868.
Here, the record shows that Officer Starliper drove up to J.F. in his police cruiser because he had not seen him previously in the Clay Street neighborhood which was known for illegal drug sales and violent crime. No one was on the street except the two police officers, J.F. and Mr. Hughes. Officer Starliper first asked J.F. whether he had heard any gunshots. J.F. responded in the negative. When Officer Starliper and Officer Rankins exited the police vehicle, their guns were visible in their waistbands and they wore police vests and police badges. The officers separated J.F. and Mr. Hughes. Officer Starliper remained with J.F. who had his hands in his pockets. Officer Starliper ordered him to remove his hands from his pockets. J.F. complied with the order, and Officer Starliper then posed questions to J.F. The questions ranged from general ones such as, what is your name, address, and date of birth, to more specific questions: what is your purpose for being in the neighborhood, do you have any weapons or contraband? As Officer Starliper posed these questions and J.F. responded, the officer noticed that J.F. frequently looked at his pants and began to breathe heavily. Officer Starliper asked J.F. if he "didn't mind if [he] searched him." Officer Starliper testified that J.F. said "go ahead." Mr. Hughes stated that he was detained on the curb approximately two feet away when Officer Starliper requested to search J.F. Officer Rankins had already completed a search of Mr. Hughes that yielded no contraband. Mr. Hughes left the area following a warrant check that revealed no outstanding warrants. In Officer Starliper's estimation, the scenario with J.F. lasted around three minutes.
Given the totality of these circumstances surrounding J.F.'s encounter with the police, including the sole presence of the officers, J.F. and Mr. Hughes in the area, the visibility of the officers' guns in their waistbands, the order that J.F. remove his hands from his pockets, the general and specific questions to J.F., and the continued holding of Mr. Hughes when no contraband was found on his person, we are constrained to conclude that "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." In re J.M., supra, 619 A.2d at 499-500 (internal quotation marks and citation omitted); see also Terry, supra, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. Hence, J.F. was seized prior to Officer Starliper's request for consent to search him.
The fact that Officer Starliper posed a few questions to J.F. by itself would not have led to a seizure. See Kelly, supra, 580 A.2d at 1286 ("There must be more than mere questioning before a court will find that a seizure has occurred.") (footnote *310 omitted). Moreover, an "officer's language and tone [may be] polite during the encounter," but "an officer's `questioning [does] not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere....'" Jackson, supra, 805 A.2d at 987 (quoting Guadalupe v. United States, 585 A.2d 1348, 1361 (D.C.1991)). Furthermore, absent other circumstances, an officer's request "that appellant take his hand out of his pocket may be considered merely a pre-seizure consensual encounter...." Duhart v. United States, 589 A.2d 895, 898 (D.C.1991); Barnes, supra, 496 A.2d at 1045 (officer's request that appellee remove his hands from his pockets, followed by two questions and voluntary answers, met the Supreme Court test under Royer for a pre-seizure, "consensual encounter").
Nevertheless, "an initially consensual encounter can be transformed into a seizure and detention within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." Hawkins v. United States, 663 A.2d 1221, 1225 (D.C. 1995) (citation omitted). Indeed, there is much more here than mere questioning or a pre-seizure, consensual encounter. J.F. was confronted with the authority of the police on a deserted street, as evidenced not only by the visibility of the officers' weapons, police vests and badges, but also by multiple questions by Officer Starliper as well as a direct order to remove his hands from his pockets, and he could see that the police continued to hold Mr. Hughes (for a warrant check) after they found no contraband on his person. Our case law identifies circumstances similar or identical to those in this case which can result in a seizure. See e.g., Reyes v. United States, 758 A.2d 35, 38 (D.C.2000) ("`[T]he officers, early in th[e] encounter, adopted a posture displaying their authority which communicated very clearly to appellant that he was not free to simply ignore them and leave.'") (citing Hawkins, supra, 663 A.2d at 1225-26); In re D.T.B., 726 A.2d 1233, 1236 (D.C.1999) (person seized where confronted by armed, ununiformed police officer in enclosed area and ordered to "come here"); Gomez v. United States, 597 A.2d 884, 889 (D.C.1991) (person seized where ordered out of car and told to place his hands on vehicle); Jones v. United States, 391 A.2d 1188, 1190 (D.C. 1978) (officer seized men when he approached them and immediately "ordered" them out of the car); Crowder v. United States, 379 A.2d 1183, 1185 (D.C.1977) (where three officers "alighted from two [nearby] squad cars" and "demanded identification," the show of authority was sufficient to effectuate a seizure). At the point in which J.F. was seized, the police officers had no "reasonable, objective grounds for doing so" and the seizure was unlawful. Royer, supra, 460 U.S. at 498, 103 S.Ct. 1319.
Our inquiry does not end with the conclusion that J.F. was unlawfully seized. The government argues, and the trial court determined, that J.F. consented to the search. However, "[w]hen a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was a `break' in the causal connection between the illegality and the evidence thereby obtained." United States v. Fox, 600 F.3d 1253, 1257 (10th Cir.2010) (internal quotation marks and citation omitted). On this record, the government has not sustained its burden, given the totality of the circumstances resulting in J.F.'s seizure, and in light of the fact that the entire incident between the *311 police and J.F. lasted only about three minutes according to Officer Starliper. As the court said in McGann, supra, "[w]hen statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." 8 F.3d at 1184 (citing Bostick, supra, 501 U.S. at 433-35, 111 S.Ct. 2382; Royer, supra, 460 U.S. at 507-08, 103 S.Ct. 1319) (other citations omitted). What the Court said in Royer is applicable here: "the consent was tainted by the illegality and was ineffective to justify the search." 460 U.S. at 507-08, 103 S.Ct. 1319; see also Duhart, supra, 589 A.2d at 901 (citing Wong Sun, supra, 371 U.S. at 471, 83 S.Ct. 407).
Accordingly, for the foregoing reasons, we reverse the trial court's decision.
So ordered.
NOTES
[*] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.
[1] Officer Starliper admitted on cross-examination that his question regarding the gunshots was "made up," and no gunshots had actually been fired.
[2] Mr. Hughes was twenty-three years-old at the time.
[3] Mr. Hughes claimed the officer "swiped J.[F.]'s waist," prior to obtaining a response from J.F. as to whether he could search him; however, Officer Starliper could not remember whether or not he touched J.F. prior to obtaining consent to search him.