Ernest **RAMSEY**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 11–CF–1485.

District of Columbia Court of Appeals.

Submitted Dec. 19, 2012.

Decided Aug. 15, 2013.

Kenneth E. McPherson, Columbia, MD, and Gregory W. Gardner, Waldorf, MD, were on the brief for appellant.

Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, John P. Mannarino, Jodi Lazarus and Karen L. Shinskie, Assistant United States Attorneys, were on the brief for appellee.

Before FISHER and THOMPSON, Associate Judges, and RUIZ, Senior Judge.

THOMPSON, Associate Judge:

Appellant Ernest Ramsey entered conditional guilty pleas to charges of carrying a pistol without a license, unlawful possession of a firearm by a felon, and possession of an unregistered firearm, after the trial court denied his motion to suppress the physical evidence. He argues that the evidence was the fruit of an unlawful seizure and that the trial court therefore erred in denying the suppression motion. We agree, and we therefore reverse.

## I. Background

At the suppression hearing, Metropolitan Police Department Officer Kevin Lally testified that on November 28, 2010, at around 7:45 p.m., he was patrolling in the 3900 block of Benning Road, N.E., when he saw appellant, whom he "didn't know ... from before then," walk into an alley that dead-ended behind a convenience store. Officer Lally saw another person "coming from the rear alley,"[1] but otherwise saw no one else in the area other than appellant. Officer Lally testified that he had been to the alley on prior occasions, and that it had been the site of "[n]umerous occasions of urination in public" as well as narcotics trafficking, robberies, and "general vagrancy." He explained that the alley "leads up to a park that's closed after dark" and that there was a closed carryout restaurant next to it but "no businesses or residences back there." Officer Lally followed appellant into the alley and, upon turning the corner, saw appellant standing, "facing the wall with his hands in his crotch area with his zipper down."[2] Officer Lally testified that he asked appellant what he was doing, and appellant replied, "Man, I was about to use the bathroom." Officer Lally did not look to see whether there was a puddle of urine and saw no urine, but testified that there was a "strong smell of urine" in the alley. Asked whether he could tell if appellant was actually urinating at the time he saw him with his pants unzipped, Officer Lally responded, "He was not, no"; he agreed that he "never saw [appellant] urinate in the alley." Officer Lally also testified that appellant's "genitalia was [not] outside his pants[.]" The officer testified, however, that he "had a good idea what [appellant] was about to do." He agreed that he was "just speculating" and that he thought "maybe something was about to be a crime[.]" He said that he "had reason to believe that if [appellant] was about to

---

[1] That person "was stopped" by another officer.

[2] Officer Lally testified that the alley was dark but that there was "adequate lighting."

urinate, he also did not have any lawful presence on that property and that whatever he was doing back there probably would have been a crime."

Officer Lally "asked to speak to" appellant further, and the two men walked out of the rear alley to the side of the store building, where Officer Lally asked appellant for identification. Asked to describe appellant's "demeanor," Officer Lally said that appellant "was cooperating physically with [the officer's] commands" and "was coming to talk to [him]," but that based on his training and experience, he could tell that appellant "was someone who didn't really want to talk to [him]." After appellant produced his identification, Officer Lally "ran him through [a] dispatcher for warrant status," i.e., had his dispatcher run a WALES (Washington Area Law Enforcement System) computer check.[3] The dispatcher responded—incorrectly, it turned out[4]—that appellant had an outstanding bench warrant for an intrafamily offense. Officer Lally placed appellant in handcuffs and told him that he was not under arrest but that the officer had "reason to believe he ha[d] a warrant out." Officer Lally testified that he asked appellant for "consent to search his person" "based upon ... the obvious attempted illegal activity" and "being in the back of that alley," but subsequently testified that the words "'Can I search you' never entered my mouth." Rather, the officer explained, he asked appellant, "Do you have anything on you?" Appellant responded, "No, I have nothing to hide. You can check me." Officer Lally then proceeded to pat down appellant's outer clothing, felt what he recognized to be a handgun, removed the gun from appellant's jacket pocket, and advised appellant that he was under arrest. Officer Lally testified that he did not point a weapon at appellant or use any weapon during his encounter with appellant. He told the court that only "two minutes, perhaps, maybe more" transpired between when he originally encountered appellant and when he found the gun.[5]

The trial court credited Officer Lally's testimony, specifically including his testimony that appellant gave consent to be searched. The court specifically discredited appellant's testimony that he "just went into the alley and walked away[.]" The court ruled that at the time the officer approached appellant and saw what he was doing, he had "probable cause to believe that a crime, that is, urinating in public[,] was occurring in front of him." The court found that "it ended up that [appellant] hadn't urinated ... [and] that [appellant]

3. Specifically, the officer "voiced [appellant's] name and date of birth over to the dispatcher" so that she "would run it through her computer and get back to [him]."

4. Officer Lally testified, without further explanation, that "[w]e confirmed ... later" that "there was no warrant outstanding," and the prosecutor confirmed (again, without explanation) that "the warrant turned out to be not valid."

5. Appellant testified that he entered the alley because he "had to use the bathroom[,]" and that he had "contemplated urinating," but that he did not have his pants unzipped and did not have his hand in his crotch area when Officer Lally confronted him. Instead, appellant testified, he had decided to leave the alley without urinating because he thought his bus was coming (his initial explanation), and because his "sixth sense" left him feeling "uneasy." Appellant testified that after he had walked out of the alley, the officer pointed a gun at him, asked what he was doing, demanded his identification, pushed him up against a wall, and then searched him without asking for his consent. Appellant denied having urinated in the alley. He also claimed, as summarized by his counsel at sentencing, that he had confiscated the gun from his nephew so that the nephew would not get into trouble, and that he had planned to turn the gun over to the police.

did not have a warrant outstanding," but reasoned that "the fact that the officer[ ] later discovered that" did not "negate the fact that at [the] time when [he] approached [appellant] and saw what he was doing ... [he] had probable cause and reasonable articulable suspicion to encounter and secure" appellant.

Appellant filed a Motion to Reconsider the ruling denying suppression of the gun, emphasizing Officer Lally's testimony that appellant was not actually urinating at the time the officer saw him with his pants unzipped, arguing that "there is no crime in the District of Columbia of *attempted* urinating in public[,]" and contending that the stop should have ended after the officer engaged appellant in conversation in the alley and confirmed that he had not actually urinated. Ruling on the motion, the trial court stated that because of the "nature of the alley and [the officer's] knowledge of the alley" and because of "defendant's actions" and "where his hands were and where his zipper was[,]" Officer Lally "did have at least reasonable, articulable suspicion to stop [appellant] and engage in an investigation as to what [he] observed." The court stated, "In retrospect we'd know that [appellant] was not engaging in urination in the public alley after investigation. But the Court's view was that the officer[ ] reasonably had reasonable suspicion."

Although appellant disputed in the trial court that he consented to Officer Lally's searching him, on appeal he does not specifically challenge the court's finding that he consented to a search. Nor does he dispute that, if he had already been lawfully stopped, the information the officer received during the stop about an outstanding warrant would have justified the officer in arresting and searching him even without his consent.[6] Appellant also appears not to seriously challenge the trial court's reasoning that because of the officer's "knowledge of the alley" and because of appellant's "actions" and "where his hands were and where his zipper was[,]" Officer Lally "did have at least reasonable, articulable suspicion to stop [appellant in the alley] and engage in an investigation as to what [he] observed." Rather, appellant asserts that by the time the officer left the alley, he had "gathered evidence that dispelled his initial suspicion" that appellant was urinating in public, such that the officer should have terminated his encounter with appellant "before determining if [he] had warrants or would consent to a search." He argues that there would have been no consent to search, and no search, but for what he contends was the unlawful detention that commenced before the officer received the results of the warrant check.[7]

## II.  Applicable Law

The scope of our review of the denial of a motion to suppress is limited. *Brown v. United States*, 590 A.2d 1008, 1020 (D.C. 1991). We view the evidence and "all reasonable inferences therefrom ... in favor of sustaining the trial court's ruling," *Howard v. United States*, 929 A.2d 839, 844 (D.C.2007) (internal quotation marks omitted), but review conclusions of law *de novo. Id.* We must "ensure that the trial court ha[d] a substantial basis for concluding

---

**6.** Appellant does not argue, for example, that his seizure at that point would have been invalid because of the misinformation Officer Lally received about an outstanding warrant.

**7.** *Cf. Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (agreeing that because the defendant "was being illegally detained when he consented to the search of his luggage, ... the consent was tainted by the illegality and was ineffective to justify the search").

that no constitutional violation occurred." *Thompson v. United States*, 745 A.2d 308, 312 (D.C.2000) (internal quotation marks omitted).

"The Fourth Amendment of the Constitution protects individuals from unreasonable seizures by governmental authorities." *Jackson v. United States*, 805 A.2d 979, 983 (D.C.2002). "A seizure does not occur simply because a law enforcement officer approaches a person on the street and asks him or her questions; the officer may engage in such encounters without violating the Fourth Amendment if the person approached is willing to listen and answer questions." *Id.* at 984. However, "[o]nce the encounter loses its consensual nature, Fourth Amendment scrutiny will be triggered." *Id.* at 986. "In determining whether the person has been seized [or stopped within the meaning of the Fourth Amendment], the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* at 984 (internal quotation marks omitted). "Generally, any restraint of a person amounting to a seizure is invalid unless justified by probable cause." *Id.* at 983 (internal quotation marks omitted). However, "[t]he police may conduct an investigatory stop on less than probable cause provided that, under the totality of the circumstances, the police officer could reasonably believe that criminal activity was afoot." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted). Nevertheless, "[a]lthough an officer may effect a stop once he observes conduct that leads him reasonably to conclude that criminal conduct may be afoot, termination of the encounter is required once the officer's suspicion is dispelled and probable cause fails to develop."

*United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.2009) (internal quotation marks omitted).

## III. Analysis

To address appellant's argument, the focus of our analysis must be two-fold: (1) whether appellant was stopped for purposes of the Fourth Amendment at some point prior to the officer's receipt of the warrant (mis)information; and (2) if so, whether, at the time appellant was stopped, the officer had undispelled probable cause or (at least) undispelled reasonable articulable suspicion that justified the stop. We proceed by considering what we conclude are three distinct stages of Officer Lally's encounter with appellant.

■ *The encounter in the alley.* According to Officer Lally's credited testimony, all that occurred in the alley was that the officer saw appellant and asked him what he was doing, appellant responded that he was "about to use the bathroom," the officer "asked to speak to" appellant further, and appellant cooperated and proceeded out of the alley to speak with the officer. We conclude that nothing in the encounter in the alley constituted a seizure, because "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■ By itself, appellant's presence in the alley—"an area of expected criminal activity"—was "not enough to support a reasonable, particularized suspicion that [appellant was] committing a crime[.]" *Henson v. United States*, 55 A.3d 859, 867 (D.C.2012) (internal quotation marks omitted). We can assume, without necessarily deciding, however, that what Officer Lally initially observed in the alley gave him reasonable articulable suspicion for an in-

vestigatory stop. The reasoning supporting that assumption is that, upon seeing appellant standing, facing a wall, with his zipper down and his hands in his crotch area, the officer could reasonably believe that appellant was committing disorderly conduct by urinating in public, and thus "could reasonably believe that criminal activity was afoot." *See Scott v. United States,* 878 A.2d 486, 488 (D.C.2005) (holding—although on facts that we distinguish *infra*—that the defendant's act of urinating in a gas station parking lot constituted disorderly conduct).

◼ The fact that Officer Lally did not actually see appellant urinating meant that he could not have arrested him (i.e., taken him into custody) on the basis of his conduct in the alley,[8] but it does not mean that the officer lacked reasonable articulable suspicion. "Under the Fourth Amendment, ... a policeman ... whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion." *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (internal quotation marks omitted); *see also Womack v. United States,* 673 A.2d 603, 608 (D.C.1996) ("[T]he police may briefly detain an individual for investigative purposes, even if they lack probable cause to arrest, so long as the officers have a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." (citing *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868)).[9] Additionally, the fact, which the court found, that appellant did not actually urinate does not mean that the officer lacked reasonable articulable suspicion when he first approached and questioned appellant. *Cf. Pleasant–Bey v. United States,* 988 A.2d 496, 501 (D.C. 2010) ("[T]o make a *Terry* stop, the police do not have to prove by a preponderance of the evidence that a defendant has committed or is about to commit a crime.").

◼ *The initial encounter outside the alley.* When appellant joined Officer Lally in exiting the alley, the officer's first action was to ask for appellant's identification. We are satisfied that this also did not constitute a seizure and thus was not a critical moment for purposes of our Fourth Amendment analysis. "The police also may ask a person to do something, such as produce identification ... without necessarily converting the encounter into a sei-

---

8. In the District of Columbia, a police officer is statutorily authorized to arrest a suspect for a misdemeanor offense only if it was committed in his presence or if the offense is one that by statute justifies immediate arrest without a warrant to prevent injury or destruction of evidence. *See* D.C.Code § 23–581(a)(1)(A)–(D) (2001); *see also United States v. Williams,* 754 F.2d 1001, 1002 (D.C.Cir.1985) ("Probable cause to believe that a misdemeanor has just been committed prior to the arrival of the police does not satisfy the District of Columbia's warrantless arrest requirements." (citing *Schram v. District of Columbia,* 485 A.2d 623 (D.C.1984); *District of Columbia v. Perry,* 215 A.2d 845 (D.C.1966))).

9. *Cf. United States v. Morgan,* No. 09–CR–00573, 2010 WL 4168624, at *2, *5, 2010 U.S. Dist. LEXIS 111128, at *5, *15 (E.D.N.Y. Oct. 19, 2010) (agreeing that officers had probable cause to arrest defendant for public urination where they "determined based on the way he was standing and the placement of his hands that he was urinating[,]" even though they were too far away to see a urine stream); *Negron v. State,* No. 569, 2008, 979 A.2d 1111, ——, 2009 WL 2581714, at *4, 2009 Del. LEXIS 439, at *12 (Del.2009) (unpublished table decision) (holding that where an officer observed the suspect standing in a public courtyard "partially obscured by a bush and facing away from the courtyard" and "was able to observe him 'shake' and zip up his pants[,]" the evidence was sufficient to constitute probable cause that the suspect was

zure." *In re J.F.*, 19 A.3d 304, 309 (D.C. 2011) (internal quotation marks and alterations omitted); *see also United States v. Lopez*, 443 F.3d 1280, 1285 (10th Cir.2006) ("It is well-established that the Fourth Amendment is not implicated when an officer approaches an individual in a public place and requests, but does not demand, to see his identification." (citing *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980))).

■ However, what is of significance about this point in the timeline is that, by the time Officer Lally exited the alley accompanied by appellant, the officer not only had learned that appellant did not urinate, but also had been able to observe that no one else was in the alley to witness

committing or had just committed the offense of disorderly conduct).

10. Furthermore, the other knowledge and speculation Officer Lally mentioned were not sufficient to justify a *Terry* stop. Although the officer knew that the alley had been the site of narcotics trafficking, robberies, and "general vagrancy[,]" and although he "speculat[ed]" that "maybe something was about to be a crime" and that "whatever [appellant] was doing back there [in the alley] probably would have been a crime[,]" that knowledge and speculation, standing alone, did not give the officer the particularized suspicion that was necessary to stop appellant. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (stating that an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch") (internal quotation marks omitted).

Regarding Officer Lally's suggestion that appellant "did not have any lawful presence on that property," the record contains no evidence that the alley behind the convenience store was private property. Officer Lally had the impression that appellant "didn't really want to talk to [him]," but that would not have been a sufficient basis for stopping appellant. *Cf. United States v. Johnson*, 496 A.2d 592, 602 (D.C.1985) (explaining that even an individual's flight from police "is insufficiently indicative of criminal activity to justify an investigatory stop solely on that

appellant's conduct. This means, we conclude, that what we have assumed was the officer's legitimate suspicion that appellant had committed or was about to commit disorderly conduct had been dispelled.[10] To explain why we so conclude, we turn to a discussion of our case law on the offense of disorderly conduct.

We begin by observing that at the time of the incident involved here, under D.C.Code § 22–1321 (2001) ("Disorderly conduct") it was unlawful for a person to "[a]ct[ ] in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others" "under circumstances such that a breach of the peace may be occasioned thereby[.]"[11]   As interpreted

basis"). And although Officer Lally referred to the alley as one known for "general vagrancy," "the District has no valid vagrancy law." *Thomas v. United States*, 557 A.2d 1296, 1298 n. 4 (D.C.1989) (citing *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C.Cir. 1968)); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 156 n. 1, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (striking down as unconstitutionally vague a Florida vagrancy statute that, *inter alia*, provided for punishment of persons convicted of "wandering or strolling around from place to place without any lawful purpose or object"); *City of Chicago v. Morales*, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (striking down as vague a law that prohibited criminal street gang members from loitering in any public place).

11. As amended in 2011, *see* D.C. Law 18–375, § 3(a) (May 26, 2011), the disorderly conduct statute now specifically makes it unlawful for any person "to urinate or defecate in public, other than in a urinal or toilet[,]" D.C.Code § 22–1321(e) (2012 Supp.), without regard to any intended or potential breach of the peace. Notably, the Council of the District of Columbia Committee on Public Safety and the Judiciary, in its Report on Bill 18–245, "the Disorderly Conduct Amendment Act of 2010," stated its view that "public urination would be better handled as a civil infraction punishable by a ticket and fine[,]" *id.* at 9, but left public urination in the disorderly statute "until the Council and Executive adopt a better process for civil infraction enforcement[.]" *Id.*

by this court, § 22–1321 made it unlawful, at least in some circumstances, to urinate in public. *See Scott*, 878 A.2d at 488. However, "[t]he major premise of [§ 22–1321 (2001)] [was] obviously a breach of the peace (or a threat thereof)[.]" *Smith v. District of Columbia*, 387 F.2d 233, 235 (D.C.Cir.1967). In *Scott*, we were satisfied that the defendant's act of public urination on the front bumper of a van parked in a gas station parking lot constituted disorderly conduct because the officer "could have considered such conduct to be an act sufficiently annoying and offensive to others that it might occasion a breach of the peace." *Scott*, 878 A.2d at 488 (internal quotation marks omitted). By contrast, in numerous cases, we have reversed disorderly conduct convictions because there was no evidence that the underlying conduct threatened a breach of the peace.[12]

■ In the instant case, we conclude that the circumstances—appellant's being about to urinate after dark in a dead-end alley that led to "a park that's closed after dark[,]" with "no businesses or residences back there" and (as Officer Lally could see when he followed appellant into the alley) *with no one else around* (and no evident puddle of urine)—did not threaten a

breach of the peace so as to constitute disorderly conduct. The government argues that the D.C. Circuit's opinion in *United States v. Williams*, 754 F.2d 1001 (D.C.Cir.1985), is persuasive authority to the contrary, but we do not agree. In *Williams*, officers arrested the defendant for disorderly conduct for urinating in the hallway of an apartment building. *See id.* at 1002. The officers, who saw the defendant fixing his pants over a puddle of urine, "could not say that they actually saw [him] urinating, [but] they saw the results thereof on the floor[.]" *Id.* The D.C. Circuit reasoned:

> We think it self-evident that fixing one's pants over a puddle of urine in the hallway of a partially occupied building at 7 p.m. is an act sufficiently annoying and offensive to others that it might occasion a breach of the peace. At a minimum, the act is such that the police would have probable cause to believe that a breach of the peace might be occasioned, and therefore would have probable cause to believe a misdemeanor was being committed in their presence.

*Id.*[13] Given the quite different facts in this case, we think the government's reliance on *Williams* is misplaced.[14]

12. *See, e.g., In re T.L.*, 996 A.2d 805, 808 (D.C.2010) (reversing ruling that juvenile committed disorderly conduct where his "loud words, though they may have annoyed or disturbed nearby residents, did not threaten a breach of the peace or manifest an intent on T.L.'s part to provoke one"); *Shepherd v. District of Columbia*, 929 A.2d 417, 419 (D.C.2007) ("[T]he bare possibility that words directed to a police officer may provoke violence by others does not suffice to show disorderly conduct; rather the words must create a likelihood or probability of such reaction ... by persons other than a police officer to whom the words were directed" or be "calculated to lead to a breach of the peace."); *accord Martinez v. District of Columbia*, 987 A.2d 1199 (D.C.2010); *In re W.H.L.*, 743 A.2d 1226 (D.C.2000); *In re M.W.G.*, 427 A.2d 440 (D.C.1981).

13. *Cf. People v. Duncan*, 259 Ill.App.3d 308, 197 Ill.Dec. 581, 631 N.E.2d 803, 804 (1994) (stating that the court had been "unable to find an Illinois case ruling that public urination can or cannot result in a disorderly conduct conviction[,]" but concluding that "urination in public ... can be done in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace[,]" and affirming disorderly conduct conviction on facts that the defendant, standing approximately 30 feet from a patron in the outdoor eating area of a restaurant, faced the patron and urinated).

14. *But see Martinez*, 987 A.2d at 1204, 1204 n. 9 ("not perceiv[ing] room for the alternative, undefined 'nuisance' criterion [for disorderly conduct] announced in *Williams* [,] that

Because the record before us is devoid of any evidence that appellant's conduct in the secluded rear alley was intended to or had the potential to occasion a breach of the peace, and because we also cannot say that appellant's conduct had the potential to "destroy[ ] or menac[e] public order and tranquility," [15] we conclude that Officer Lally's investigation left him, by the time he exited the alley, without a reasonable basis for thinking that appellant had committed or was about to commit the offense of disorderly conduct.[16] In other words, what (we assume) had objectively been reasonable suspicion had been dispelled. Officer Lally also was without a basis for detaining appellant to issue him a civil citation.[17] Accordingly, we hold, the officer did not have a lawful basis for detaining appellant at the time he exited the alley (but before the officer received the results of the warrant check).[18]

The WALES warrant check. As we discussed above, we are satisfied that, for purposes of the Fourth Amendment, Officer Lally did not stop appellant when, having exited the alley with him, he merely asked him for his identification. However, the situation changed at the point when

would permit conviction without threat of violence" in cases involving speech, but acknowledging the possibility that "the 'nuisance' alternative survives in non-speech cases" such as Williams, which "opined that urinating in public would serve to justify probable cause for a police officer to believe that both an annoyance and a breach of the peace were occurring sufficient to warrant an arrest for disorderly conduct under D.C.Code § 22–1321").

**15.** District of Columbia v. Jordan, 232 A.2d 298, 299 (D.C.1967) (holding that the "activities of a peeping Tom would certainly constitute a menace to the tranquility of a neighborhood" and thus constituted disorderly conduct (quoting Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940))).

**16.** A fortiori, by that time the officer also lacked probable cause to believe that appellant had committed or was about to commit disorderly conduct or (as the government argues) to believe that appellant had committed the (possible) offense of attempted disorderly conduct.

**17.** Under 25 DCMR, Subchapter I, § 100.1, urine is declared to be a substance that is, "[w]hen thrown, placed, or allowed to remain in or upon any street, avenue, alley, sidewalk, gutter, public reservation, or open lot in the District of Columbia, ... a nuisance injurious to health[,]" and, pursuant to 25 DCMR, Subchapter I, § 100.2, "[a]ny person who commits, creates, or maintains" such a nuisance "shall, upon conviction, be fined not less than five dollars ($5) or more than twenty-five dollars ($25) for each offense." Accordingly, if Officer Lally believed that appellant had urinated in the alley, he could have detained him to issue a citation under § 100.2 and would not have infringed on appellant's Fourth Amendment rights by briefly extending that detention to do a warrant check. Cf. Ford v. United States, 376 A.2d 439, 441 (D.C.1977) (reasoning that, during an investigatory traffic stop, "it is permissible for the officer to ... detain the driver long enough for a WALES check to be run"). However, as already described, the officer did not see appellant urinate in the alley and also saw no urine there.

**18.** Cf. Jackson v. United States, 56 A.3d 1206, 1212 (D.C.2012) (reasoning that because the officer's concerns about the rocking of a "van were largely dispelled when he immediately saw that the occupants had switched places and understood why the van had been rocking[,]" the fact that the van had been rocking did not establish the lawfulness of the officer's action in searching the van for weapons); United States v. Pena–Montes, 589 F.3d 1048, 1058 (10th Cir.2009) ("[T]he law enforcement officer should not have questioned the driver of the vehicle after his sole cause for suspicion was dispelled."); United States v. Winder, 557 F.3d 1129, 1134 (10 Cir.2009) ("Although an officer may effect a stop once he observes conduct that leads him reasonably to conclude that criminal conduct may be afoot, termination of the encounter is required once the officer's suspicion is dispelled and probable cause fails to develop.") (internal quotation marks omitted).

Officer Lally requested the WALES check. At that point, we conclude, because appellant would not have felt free to leave, the encounter became a seizure [19]—for which Officer Lally no longer had reasonable, articulable suspicion, for the reasons already discussed.

As mentioned in note 17 *supra*, we have held that during a valid investigatory stop, an officer may also detain the suspect "long enough for a WALES check to be run." *Ford*, 376 A.2d at 441.[20] It appears, however, that we have never addressed whether, in the absence of (continuing) reasonable articulable suspicion that an individual has committed another offense, detaining the individual while a WALES check is run constitutes a seizure. Many other courts have addressed that situation, however, and most have held that detaining the individual even for a few minutes for a warrant check constitutes a seizure that is unlawful in the absence of probable cause or a reasonable, articulable basis to suspect the individual of a criminal offense.[21] We reach a similar conclusion in

**19.** *Commonwealth v. Lyles*, 453 Mass. 811, 905 N.E.2d 1106, 1110 (2009) (stating that "[b]y retaining defendant's identification [to run a check for outstanding warrants, the officers were] implicitly commanding the defendant to remain on the scene" and that "a reasonable person would not believe that he could terminate the encounter and leave"); *State v. Daniel*, 12 S.W.3d 420, 427 (Tenn. 2000) (holding that even though the encounter was not accompanied by physical force or restraint or the drawing of a weapon, "a seizure within the meaning of the Fourth Amendment ... occurred when [the police officer] retained Daniel's identification to run a computer warrants check") (collecting cases); *Salt Lake City v. Ray*, 998 P.2d 274, 281 (Utah Ct.App.2000) (reasoning that although Ray was not seized by the officers' original request for identification, the encounter escalated into a seizure when one of the officers retained Ray's identification for about five minutes while running a warrant check); *State v. Thomas*, 91 Wash.App. 195, 955 P.2d 420, 423 (1998) (stating that "[o]nce an officer retains the suspect's identification or driver's license and takes it with him to conduct a warrants check, a seizure within the meaning of the Fourth Amendment has occurred").

**20.** Similarly, "[w]hile Supreme Court precedent does not say that 'obtaining more information' [through a warrant check] is always appropriate, some [federal] circuits have expressly held that officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected." *United States v. Young*, 707 F.3d 598, 606 (6th Cir. 2012) (concluding on that basis that officers had a right to run a warrant check unrelated to the suspected crime of trespassing even though "running a warrant check is [neither] the quickest way to confirm or dispel suspicion of trespass, nor ... the least intrusive means of investigation").

**21.** *See, e.g., United States v. Gross*, 662 F.3d 393, 406 (6th Cir.2011) (holding that a firearm "must be suppressed as fruit of the poisonous tree" since it was found after an officer, who was without a particularized and objective basis for suspecting Gross of criminal activity, ran a warrant check on him and then arrested him on an outstanding felony warrant); *Lyles*, 905 N.E.2d at 1110 (holding that where officers, based only on their observation of the defendant as he walked along a public sidewalk, approached the defendant, displayed their badges, asked the defendant for identification, proceeded to radio for a check of outstanding warrants, and then, discovering one, placed the defendant under arrest and found heroin on his person, knowledge of the warrant was the fruit of an unlawful seizure and the heroin had to be suppressed); *United States v. Lopez*, 443 F.3d 1280, 1286 (10th Cir.2006) (holding that because the government did not have probable cause or reasonable articulable suspicion to detain Lopez until a warrants check was completed, the seizure violated the Fourth Amendment, even though the police officer retained Lopez's license for only five minutes); *Salt Lake City*, 998 P.2d at 281 (holding that because there was no reasonable articulable suspicion for officers to retain individual's identification for about five minutes while running a warrant check, the seizure violated the individual's rights under the Fourth Amendment); *United*

this case: that the detention of appellant for a WALES check, although brief in duration, was a seizure, for which Officer Lally lacked reasonable articulable suspicion or probable cause, and which therefore violated appellant's rights under the Fourth Amendment.

The fact that the WALES check extended what had been Officer Lally's consensual encounter with appellant by only a brief time (perhaps less than a minute or two) did nothing to negate the fact that the warrant check turned the encounter into a seizure. *Cf. United States v. De La Cruz,* 703 F.3d 1193, 1197 (10th Cir.2013) ("Once reasonable suspicion has been dispelled, even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment.") (internal quotation marks and alterations omitted); *see also Royer,* 460 U.S. at 498, 103 S.Ct. 1319 (A person "may not be detained even momentarily without reasonable, objective grounds for doing so"). Indeed, "the fact that the entire incident between the police and [appellant] lasted only about [a few] minutes" supports a holding that the gun Officer Lally found on appellant should have been suppressed notwithstanding appellant's "statement[ ] . . . evidencing consent to a search," because it compels a conclusion that the statement was "given contemporaneously with the illegal seizure, with no break in the causal chain," such that it was "not free from the taint of unlawful detention[.]" *In re J.F.,* 19 A.3d at 310–11.

■ In sum, since it was the unlawful detention for the WALES check that occasioned appellant's remaining on the scene

for Officer Lally to handcuff him, ask whether he had anything on him (occasioning his consent to a search), and to search his person, we hold that the gun, which was the fruit of that detention, should have been suppressed, notwithstanding appellant's consent to the search. *Cf. United States v. Edgerton,* 438 F.3d 1043, 1051 (10th Cir.2006) (holding that where officer, who stopped a driver because her temporary license tag was illegible, was able to read the tag and confirm that no violation had occurred after approaching her car but nevertheless took her license and registration and obtained her consent to search the car, the cocaine discovered during the search must be suppressed, because the officer should have sent the driver on her way upon realizing that her license tag was valid).

Wherefore, the judgments of conviction are

*Reversed.*

RUIZ, Senior Judge, concurring:

Judge Thompson's opinion for the court "assume[s], without necessarily deciding" that Officer Lally had a reasonable suspicion that would have permitted him to stop appellant when first encountering him in the alley, because "upon seeing appellant standing, facing a wall, with his zipper down and his hands in his crotch area, the officer could reasonably believe that appellant was committing disorderly conduct by urinating in public." See *ante* at 144. Judge Thompson concludes, however, that because any suspicion was "dispelled" in short order, the officer could not continue

<hr />

States v. Luckett, *484 F.2d 89, 91 (9th Cir. 1973) (holding that police officer was justified in detaining an individual who was stopped for jaywalking only during the time necessary to obtain satisfactory identification and to execute a traffic citation, and that when the officer had completed those func-*

*tions but continued to detain the individual for the purpose of running a warrant check, without reasonable grounds to be suspicious that there might be a warrant outstanding against him, the "continued detention was unreasonable, and its fruits, therefore, were properly suppressed").*

to hold appellant. *Id.* at 145. Judge Fisher's dissenting opinion, on the other hand, concludes that once appellant was properly stopped, the officer's subsequent actions were reasonable under the Fourth Amendment. See *post* at 152–53. Although I agree with Judge Thompson's ultimate conclusion that there was a Fourth Amendment violation, I disagree with the underlying assumption—made express in the dissenting opinion—that the officer was justified in seizing appellant in the first instance.

In order for a police officer to engage in a *Terry* stop, the officer must have "a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." *Womack v. United States*, 673 A.2d 603, 608 (D.C.1996). Although "[t]he requirement of articulable suspicion ... 'is not an onerous one,'" *Joseph v. United States*, 926 A.2d 1156, 1160 (D.C.2007) (citation omitted), it "must be 'objective,' so that a 'gut' feeling or 'hunch' will not do." *Brown v. United States*, 590 A.2d 1008, 1014 (D.C.1991). And, critically in this case, the suspect action must actually be "a crime." *United States v. Bellamy*, 619 A.2d 515, 523 (D.C. 1993) (actions that "fell just shy of" conduct punished by statute could not form a basis for reasonable suspicion).

It is important to note that at the time appellant was stopped, the act of public urination—by itself—did not constitute the crime of disorderly conduct, see *ante* at 145, n. 11, which is the only justification proffered by the government for the officer's suspicion of criminal conduct. It was not until the disorderly conduct statute was amended in 2011, that public urination was statutorily identified as an act of "disorderly conduct." In order for public urination to constitute disorderly conduct under the law that existed at the time appellant was stopped, he had to be

posing some actual or potential threat to public order. *Compare Scott v. District of Columbia*, 184 A.2d 849, 851 (D.C.1962) (disorderly conduct by protestors who refused to move from a public sidewalk directly in front of entrance to White House); *Rockwell v. District of Columbia*, 172 A.2d 549, 551–52 (D.C.1961) (leader of the American Nazi Party properly arrested for disorderly conduct after racist speeches caused rioting and fighting between his followers and spectators), *with In re W.H.L.*, 743 A.2d 1226, 1229 (D.C. 2000) (no disorderly conduct where defendant's obscene comments and insults were directed solely at police officer and did not urge bystanders to commit violent acts).

Under the "disorderly conduct" statute then in existence, appellant would not have been committing a crime had he, in fact, urinated on the wall in the alley as the officer suspected. Our "public-urination-as-disorderly-conduct" case law has shied away from a categorical conclusion that *any* urination in public spaces constitutes disorderly conduct. Rather, we have required, as the previous version of the statute provided, that in order for the conduct to be deemed a crime, there must be some member of the public who would be sufficiently provoked by the defendant's conduct to engage in a breach of the peace. *Scott v. United States*, 878 A.2d 486, 488 (D.C.2005) ("The officer saw Scott urinate on the front bumper of a van parked in a gas station parking lot and could have considered such conduct to be an act sufficiently annoying and offensive *to others* that it might occasion a breach of the peace." (emphasis added) (internal quotation marks and citation omitted)); *see also United States v. Williams*, 754 F.2d 1001, 1002 (D.C.Cir.1985) ("We think it self-evident that fixing one's pants over a puddle of urine in the hallway of a partially occupied building at 7 p.m. is an act sufficiently annoying and offensive *to others* that it

might occasion a breach of the peace." (emphasis added)).

The record in this case does not reveal an "other" who might have been so annoyed and offended by appellant's conduct that it would have or could have "destroy[ed] or menac[ed] public order and tranquility." *Cantwell v. Connecticut,* 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (defining "breach of the peace"); *cf. Shepherd v. District of Columbia,* 929 A.2d 417, 418 (D.C.2007) (reversing disorderly conduct conviction where defendant's "cursing and screaming" was not "likely to produce violence on the part of others" (internal citations and quotation marks omitted)). According to Officer Lally, the only other civilian present on the scene had exited or was leaving the alley (was "coming out of the alley") as appellant entered it. Otherwise, according to Lally, there was "nothing" in that area, "no businesses or residences" on the "dead-end" alley, just "a park that's closed after dark." And, at 7:45 p.m. in late November, it was dark outside. In short, appellant's suspected act of urination would have taken place in almost complete seclusion,[1] and in an area where others were unlikely to encounter him standing over an upsetting "puddle of urine" near their threshold. *Williams,* 754 F.2d at 1002. As a result, I see no objective basis from which the officer reasonably could have thought that a breach of the peace was likely to be occasioned by appellant's conduct. *See also Martinez v. District of Columbia,* 987 A.2d 1199, 1201 n. 3 (D.C.2010) (suggesting government's case had failed to identify an offended member of the public).

To be sure, cases on urination as disorderly conduct also evince a concern for the potential reaction of the owner (or lessors) of the property being urinated on, even if not present at the time. *See Scott,* 878 A.2d at 488 (holding that, in addition to disorderly conduct, defendant could have been arrested for "defacing private property in violation of D.C.Code § 22–3312.01"); *Williams,* 754 F.2d at 1001–02 (repeatedly mentioning that the apartment building in question was "partially occupied"). But even assuming that the "others" mentioned in the statute could be extended to include those who, at some point after the fact, encounter the results of public urination and are consequently offended to the point of posing a menace to public order and tranquility, the facts in this case contain no more than a hypothetical possibility that such a person might exist.

Although a nearby convenience store had a wall bordering the alley, Officer Lally did not specify whether appellant was threatening to urinate on that wall or on the wall of the "closed ... carryout restaurant next to it." Even assuming that someone owned the alley wall in question and that that person would have been offended or annoyed had he or she discovered, at some point, that appellant had urinated on it, there are no objective facts to support a conclusion that this hypothetical person would have become so incensed as to pose a menace to public order. Dumpsters were stored near or in this

---

1. Excepting, of course, the presence of Officer Lally. In line with the assumptions made by this court in other disorderly conduct cases, this court could safely assume that the officer would not have breached the peace over the discovery of someone urinating in an alley after dark. *Cf. Shepherd,* 929 A.2d at 419 (explaining that the focus must be on the reactions of civilians, not police officers, "because a police officer is expected to have a greater tolerance for verbal assaults") (internal alterations and quotation marks omitted); *In re W.H.L.,* 743 A.2d at 1228.

alley, which, according to Officer Lally, contained essentially nothing.[2] It is difficult to imagine a person who would pose a threat to public order upon discovering urine in such an out-of-the-way place at some point after appellant left, and certainly no facts in this record would lead to a reasonable suspicion that such a person existed here. *See Martinez,* 987 A.2d at 1202 (explaining that a "bare possibility" that conduct could have posed threat to public order is insufficient, and requiring a "likelihood or probability" of a disturbance (internal quotation marks and citation omitted)).

Here, the record reveals that appellant, although outdoors, was about as far out of the public eye as one can get in our urban jurisdiction. Moreover, there was nothing in the manner in which appellant acted that identified him as a provocateur of a breach of the peace. Officer Lally testified that although he suspected appellant was about to urinate because he was "facing the wall with his hands in his crotch area with his zipper down," the officer also testified that appellant was not publicly exposing himself ("genitalia" not "outside his pants"). Indeed, it is difficult to conceive of a more discrete location, time, and manner. I perceive no threat of public disturbance on these facts. Accordingly, as the act of urination in a public area was the only conduct of which the officer reasonably could have suspected appellant, Officer Lally did not have a reasonable articulable suspicion that appellant was about to commit the crime of disorderly conduct.

FISHER, Associate Judge, dissenting:

The trial court found as a matter of fact that appellant consented to a search of his person. That finding is amply supported by the evidence, and appellant makes no effort to demonstrate that his consent was involuntary. He asserts, rather, that his consent to search is irrelevant because it is the fruit of an illegal detention. I cannot agree.

Officer Lally had a reasonable, articulable basis for detaining appellant because it appeared that he either had urinated in a public alley or was about to do so. Even prior to the recent amendment of the statute, see *ante* note 11, the officer was not required to shrug his shoulders and walk away. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Sometimes, as was the case here, a brief investigation will establish that no crime has been committed.

"[I]t is well established that an officer may ask a suspect to identify himself in the course of a *Terry* stop...." *Hiibel v. Sixth Judicial Dist. Court of Nevada,* 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004).[1] Officer Lally properly used the identifying information to initiate a check for outstanding warrants. "Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." *Id.* "When a lawful stop occurs,

2. Indeed, other than appellant, Officer Lally testified that the alley contained only "broken glass," "litter," and "a strong smell of urine."

1. As the majority recognizes, the police may ask a person for identification "without necessarily converting the encounter into a sei-

zure." *In re J.F.,* 19 A.3d 304, 309 (D.C.2011) (citation omitted). Therefore, we need not determine whether appellant was seized before or after the officer asked for identification.

identification and warrant checks are basic police practices." *United States v. Young,* 707 F.3d 598, 606 (6th Cir.2012). Thus, the officer "did not exceed the reasonable scope of a *Terry* stop by running a warrant check." *Id.; see also United States v. Villagrana–Flores,* 467 F.3d 1269, 1277 (10th Cir.2006) (pedestrian's "Fourth Amendment rights were neither violated when his identity was obtained during a valid *Terry* stop nor when his identity was shortly thereafter used to run a warrants check"); *State v. Walker,* 292 Kan. 1, 251 P.3d 618, 628 (2011) (officer "did not exceed the detention's constitutionally permissible boundaries by taking [pedestrian's] ID and using it to run a computer records check").

At some point during their encounter, Officer Lally determined that appellant had not in fact urinated, but I reject appellant's argument that Officer Lally was obliged to send appellant on his way before the officer learned the results of the warrant check. *Cf. Ohio v. Robinette,* 519 U.S. 33, 35, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (holding that the Fourth Amendment does not require "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary"). Of course, the police may not unduly prolong a *Terry* stop, *see Hiibel,* 542 U.S. at 185–86, 124 S.Ct. 2451 ("the seizure cannot continue for an excessive period"), but that did not happen here. Officer Lally testified that only "one to two minutes, perhaps, maybe more," elapsed from the time he first encountered appellant and when he found the pistol during a search conducted with appellant's consent. *See Young,* 707 F.3d at 606 ("The *Terry* stop lasted only four minutes, no longer than it took Officer Johnson to conduct the warrant check. The officers were reasonable in maintaining the status quo by telling Young to 'sit tight' while they completed the check."); *United States v. Burleson,* 657 F.3d 1040, 1042, 1049 (10th Cir.2011) (reversing suppression order on government appeal; officer did not improperly extend detention by running warrant check during investigatory stop of pedestrian—three to five minutes was an objectively reasonable time).

The "touchstone of the Fourth Amendment is reasonableness." *Robinette,* 519 U.S. at 39, 117 S.Ct. 417 (citation omitted). Officer Lally acted reasonably in stopping appellant, in asking for identification, in running a warrant check, and in asking for consent to search. The seizure of appellant, valid at its inception, was not unduly prolonged, so there was no unlawful seizure and his consent to a search of his person was not obtained by exploitation of an illegal detention. The trial court properly denied appellant's motion to suppress, and the judgment of conviction should be affirmed.

