**Louis JACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 98–CF–757.

District of Columbia Court of Appeals.

Argued Nov. 16, 1999.
Decided Aug. 29, 2002.

---

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Stephen J. Gripkey, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman and Timothy J. Hea-

phy, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and SCHWELB, Associate Judges.

WAGNER, Chief Judge:

Appellant, Louis Jackson, was indicted for carrying a pistol without a license (D.C.Code § 22–3204(a) (1981)),[1] possession of an unregistered firearm (D.C.Code § 6–2311(a) (1981)),[2] and possession of unregistered ammunition (D.C.Code § 6–2361(3) (1981)).[3] Following denial of a pretrial motion to suppress the pistol and ammunition that the police recovered from him in a street encounter, Jackson entered a conditional plea of guilty to carrying a pistol without a license, reserving his right to appeal from the order denying his motion to suppress. On appeal, Jackson argues that the police seized the evidence in violation of his Fourth Amendment rights, and therefore the trial court erred in denying the motion to suppress. The government contends that the police conduct was lawful under the Fourth Amendment because the police ascertained through an inadvertent touching, during a consensual encounter, that Jackson appeared to be armed. We conclude that the seizure was not warranted under the totality of the circumstances. Therefore, we reverse and remand.

**I.**

At the hearing on the motion to suppress, there was only one witness, Officer Harry Allen, of the Metropolitan Police Department. Officer Allen testified that, while at the police station, he received a

---

1. This section has been recodified as D.C.Code § 22–4504 (2001).

2. This section has been recodified as D.C.Code § 7–2502.01 (2001).

3. This section has been recodified as D.C.Code § 7–2506.01 (2001).

telephone call from a woman who said that a man had been standing in front of her apartment at 824 18th Street, N.E., and blocking the walkway. The caller provided a description of the man and "mentioned something to [the officer] about a lookout." Officer Allen testified that the caller said that she feared for her safety because there had been a number of shootings in the area in the past week. The officer testified that he had spoken to the woman, who sounded like an elderly person, on at least three prior occasions, and that she had provided information that led to search warrants for drug activity. He testified that the caller, who did not give her name, made no mention of the presence of a gun that evening and provided no information linking the man she described to the shootings or to drug transactions. Officer Allen said that the area had been his "beat" for two or three years and that he was aware of some of the shootings on that block. He testified that he had made drug and gun lockups in the area.

Officer Allen waited at the station for his partner for about an hour before going out to investigate. At about 5:30 p.m., he and his partner went to the 18th Street area where they saw Jackson, who matched the description given by the caller, standing in front of the apartment address she had given.[4] The record is not clear whether the officers were in uniform, but they had their weapons within view.[5] The two officers, who drove up in an unmarked car, walked over to Jackson, and Officer Allen asked him if he had any drugs or weapons on him. Jackson responded that he did not. Officer Allen then asked, "could" or "can" "you raise your jacket for me," and Jackson complied. The officer testified that he did not see anything, and he continued to engage Jackson in conversation. The officer asked Jackson how long he had been there, and Jackson said for a "while." He asked whether Jackson lived in the neighborhood, to which Jackson responded that he did not. Officer Allen then asked Jackson if he was visiting anyone, and Jackson pointed to 828 18th Street, N.E., and said that he was visiting Adrian. He asked Jackson for Adrian's last name, and Jackson responded, "Thomas." Officer Allen testified that he knew an Adrian Mosbray whose mother lived at that address and that he was the only Adrian who was at that address; therefore, the officer concluded that Jackson was not being candid. According to the officer, reliable sources had reported that Mosbray dealt drugs in the neighborhood. Officer Allen testified that at that point, he became concerned for his safety and decided to "pat down" Jackson. The two men were standing about a foot apart at the time.

Officer Allen testified that he said to Jackson, "please turn around for me." The officer said that his hands were in front of him, and when Jackson began to turn, his "hand hit the right of [Jackson's] pocket and kind of like gripped it and [he] felt a gun."[6] At another point, the officer indicated that he felt the hard object when he patted Jackson's right front pants pocket. He also testified that he had not started to touch Jackson at the time he felt the object because he was waiting for him to

---

**4.** The caller had described the man as about 5'6%" tall, dark complected, wearing a red and yellow jacket, green pants and glasses.

**5.** Officer Allen testified that he was in plain clothes while at the police station, but the record does not indicate how Officer Horn was dressed.

**6.** Officer Allen acknowledged that he had sworn in an affidavit that he discovered the gun when he "patted down the defendant's right front pocket."

turn around. After the officer gripped the object, Jackson looked at him and then ran, and the officer gave chase, caught him within a half block, and removed the weapon.

Initially, the government argued that Jackson had not been seized until the officer reached to pat down Jackson. However, before the trial court ruled on the motion, the government argued that the encounter between Jackson and the police was consensual and that the Fourth Amendment was not implicated until Jackson was apprehended after the officer felt the weapon. Based on Officer Allen's testimony, which the trial court credited, it found that Jackson's compliance with the officer's request to raise his jacket and turn around was consensual and that the officer had made no show of authority up to that point. The trial court concluded that a Fourth Amendment seizure did not occur until the officer squeezed Jackson's pocket. The court held that a combination of factors known to the officer, including the information provided by the caller, Jackson's suspected lack of candor about Adrian, information about Adrian's drug activities, and feeling a hard object, provided the officer with an articulable suspicion supporting his action in squeezing Jackson's pocket. Finally, the court concluded that once the officer felt the weapon and Jackson ran, the officer had probable cause to arrest Jackson and seize the gun.

## II.

Jackson argues that the trial court erred in denying the motion to suppress because Officer Allen seized him without reasonable grounds to believe that he had committed a crime. He contends that by the time he complied with the officer's request that he "turn around," he had already been seized because no reasonable person would have felt free to leave under the circumstances. Jackson concedes that the officer had the right to approach him and ask questions about drugs and weapons; however, he contends that the encounter ceased to be consensual when Officer Allen requested that he lift his jacket and that, undoubtedly, a seizure had occurred by the time the officer asked him to turn around in order to pat him down. The government argues that the trial court properly ruled that no seizure occurred until the officer squeezed the gun, and given the knowledge available to him at the time, the officer had reasonable, articulable suspicion to believe that Jackson might be armed and dangerous. Therefore, the government contends, the officer acted lawfully under the Fourth Amendment when he squeezed the hard object in order to determine if it was a weapon.

The Fourth Amendment of the Constitution protects individuals from unreasonable seizures by governmental authorities. *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citing *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). Generally, "any restraint of a person amounting to a 'seizure' is invalid unless justified by probable cause." *Hawkins v. United States*, 663 A.2d 1221, 1225 (D.C. 1995) (citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). The police may conduct an investigatory stop on less than probable cause provided that, "under the totality of the circumstances, the police officer could reasonably believe that criminal activity was afoot." *Duhart v. United States*, 589 A.2d 895, 897 (D.C.1991) (citing *Terry*, 392 U.S. at 29–30, 88 S.Ct. 1868). Where there is a challenge to an improper *Terry* stop, the threshold question is whether a seizure has occurred. *See Smith v. United States*, 558 A.2d 312, 314 (D.C.1989) (en banc). "A seizure occurs where the officer by show of authority restrains the liberty of a

citizen." *Duhart*, 589 A.2d at 897 (citing *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868). A seizure does not occur simply because a law enforcement officer approaches a person on the street and asks him or her questions; the officer may engage in such encounters without violating the Fourth Amendment if the person approached is willing to listen and answer questions. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Guadalupe v. United States*, 585 A.2d 1348, 1354 (D.C.1991) (citing *Royer*, 460 U.S. at 497, 103 S.Ct. 1319). Such an encounter will not trigger Fourth Amendment protection unless it ceases to be consensual. *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382. Where the encounter loses its consensual nature, scrutiny under the Fourth Amendment is triggered. *Id.* (citing *Terry*, 392 U.S. at 19, n. 16, 88 S.Ct. 1868). In determining whether the person has been seized, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437, 111 S.Ct. 2382 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (other citation omitted)); *In re J.M.*, 619 A.2d at 497, 499–500 (D.C.1992) (en banc) (citation omitted). If the person stopped is free to leave, then he has not been seized within the meaning of the Fourth Amendment. Applying these principles, we consider when Jackson was seized within the meaning of the Fourth Amendment.

The evidence was undisputed that there were two officers who approached Jackson with weapons in view, and that Officer Allen stood within a foot of Jackson as he questioned him. The officer did not inform Jackson that he could refuse to answer questions or decline the initial request to look under his shirt. However,

Officer Allen testified that his tone was conversational during questioning, and his request that Jackson raise his jacket was not stated in the form a command.

Jackson argues that the trial court erred in denying the motion to suppress evidence because the police officer seized him within the meaning of the Fourth Amendment without reasonable grounds to believe that he had committed a crime. Jackson concedes correctly that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick*, *supra*, 501 U.S. at 434, 111 S.Ct. 2382. For such consensual encounters, reasonable suspicion is not required. *Id.* However, where the encounter loses its consensual nature, scrutiny under the Fourth Amendment is triggered. *Id.* (citing *Terry*, *supra*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868). Jackson argues that the contact in this case ceased to be consensual when Officer Allen requested him to lift his jacket. He contends that under the totality of the circumstances, no reasonable person would have felt at liberty to decline the officer's request and terminate the encounter with the officer, and therefore, an unlawful seizure occurred. *Id.* at 434, 111 S.Ct. 2382 (citing *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' . . . the encounter is consensual and no reasonable suspicion is required.").

Jackson's argument is premised on the theory that the seizure had occurred by the time the officer requested that he turn around in preparation for frisking him for weapons. At that point, Jackson contends, no reasonable person would have felt free to leave and not to comply with the officer's request. *Id.* The government concedes essentially that there was no basis for a *Terry* stop and frisk before the offi-

cer felt the hard object in Jackson's pocket and squeezed it. The government contends, however, that under the totality of the circumstances, the officer's inadvertent touching of the hard object in Jackson's pocket provided a reasonable articulable suspicion that Jackson might be armed and dangerous. Thus, the government contends, the willful squeeze of the weapon by the officer (and consequent seizure of Jackson's person) were lawful under the Fourth Amendment.

Pertinent to our inquiry, the trial court found, crediting the officer's testimony, the following:

> Based on the officer's testimony, he asked defendant to raise his jacket. The Court finds that was consensual. The officer's testimony was that he asked the defendant to turn around. The court finds that that was consensual. And at that point based on the officer's testimony, that he had not, meaning the officer had not made a show of authority that the defendant just submitted. He just did what the officer asked him to do. And that the circumstances known to the officer at the point that his hand touched the defendant's pocket, as the officer's hand was going up and the defendant was turning around and he felt the hard object, based on the factors known to the officer at that time, that is that the call had come in, that the defendant did indicate that he had been standing there all day. In the officer's mind, there was an inconsistency about Andre [sic]. And that in the officer's mind, the Andre [sic] from that building was a drug dealer, that feeling the hard object, that the officer had authority at that point, specific articulable suspicion to squeeze the pocket and determine that that was a weapon there.

 Whether a seizure has occurred for Fourth Amendment purposes is a ques-

tion of law which this court reviews *de novo*, deferring to the trial court's factual findings, unless clearly erroneous. *J.M.*, *supra*, 619 A.2d at 500 (citing *Guadalupe*, *supra*, 585 A.2d at 1352 n. 7). Whether a citizen has voluntarily consented to a search involves a separate inquiry to which we apply a different standard of review. *Id.* (citation omitted). We are " 'bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous.' " *Id.* (quoting *Kelly v. United States,* 580 A.2d 1282, 1288 (D.C.1990)) (quoting *Childress v. United States,* 381 A.2d 614, 618 (D.C.1977) (other citation omitted)). The critical test for determining whether a seizure has occurred within the meaning of the Fourth Amendment is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* at 499–500 (citing *Bostick, supra*, 501 U.S. at 437, 111 S.Ct. 2382) (quoting *Chesternut, supra*, 486 U.S. at 569, 108 S.Ct. 1975) (other citation omitted) (other internal quotation marks omitted). The other separate inquiry, whether a person voluntarily consented to a search, focuses specifically upon the individual involved, taking into account the person's subjective understanding. *Id.* at 500 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 229, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). In reviewing the trial court's factual determination that the search was voluntary, we " 'uphold the trial court's finding that the search was consensual unless such a finding is clearly erroneous.' " *Id.* (quoting *Kelly,* 580 A.2d at 1288).

We do not consider the trial court's determination that Jackson turned around and that this was consensual as a factual finding that Jackson voluntarily consented to the police action. The decision in con-

text is not premised on the basis of a voluntary consent to a pat down or search. Specifically, the trial court does not find that Jackson consented to the squeeze or the pat down. Further, there was no specific evidence that Jackson was asked to agree to a pat down or the squeeze. Secondly, while using the word "consensual," the court's analysis was based upon when the seizure occurred and whether there was reasonable articulable suspicion justifying the officer in squeezing Jackson's pocket at that time. Under the circumstances, we are persuaded that the trial court's finding that based upon all of the circumstances there was a legitimate basis for the squeeze, as well as when the seizure occurred, were conclusions of law requiring *de novo* review. *See J.M., supra,* 619 A.2d at 500.

 A consensual police-citizen encounter may progress to a *Terry* stop. Once the encounter loses its consensual nature, Fourth Amendment scrutiny will be triggered. *Bostick, supra,* 501 U.S. at 434, 111 S.Ct. 2382 (citing *Terry, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868). Such a stop "may occur, consistent with the strictures of the Fourth Amendment only if the police officer has reasonable suspicion, based on articulable facts that criminal activity is afoot." *United States v. Edmonds,* 948 F.Supp. 562, 565 (E.D.Va. 1996) (citing *Terry,* 392 U.S. at 29, 88 S.Ct. 1868) (other citations omitted). During a valid *Terry* stop, the police may conduct a limited, protective search for weapons if it appears that the person being investigated is armed and presently dangerous to the officer and others. *Terry,* 392 U.S. at 24, 88 S.Ct. 1868. Where the initial encounter is consensual, but progresses to a nonconsensual situation, the validity of the seizure may depend upon when the seizure

occurred. *See United States v. Barnes,* 496 A.2d 1040, 1042 (D.C.1985).

In the present case, the government argues that the trial court properly determined that the seizure took place at the point that Officer Allen squeezed Jackson's pocket. It contends that the police had made no show of authority before that point; that the initial brush with Jackson's pocket was inadvertent; and that only when Officer Allen squeezed the weapon did a seizure occur within the meaning of *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).[7] Therefore, the government contends, the propriety of Jackson's seizure should be evaluated against what the officer knew before he squeezed the weapon. Jackson argues that the alleged inadvertent touching of the weapon is irrelevant to the inquiry because the frisk began when the officer told him to turn around in preparation for conducting it. Alternatively, Jackson contends that the feeling of a hard object in Jackson's pocket by the officer, even with the other information the officer had at that point, did not provide justification for a frisk. Thus, critical to our review is a determination of when the seizure occurred.

A police officer may approach a citizen on the street and question him or her without violating the Fourth Amendment, if that person is willing to listen and answer questions. *Bostick, supra,* 501 U.S. at 434, 111 S.Ct. 2382; *see also Barnes, supra,* 496 A.2d at 1044. However, a seizure occurs where the police conduct would " 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382 (quoting *Chesternut, supra,* 486

---

7. The issue in *Hodari D.* was "whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield." 499 U.S. at 626, 111 S.Ct. 1547. The court held that it does not. *Id.*

U.S. at 569, 108 S.Ct. 1975). The question is at what point in the encounter between Jackson and the police officers would a reasonable person have been warranted in believing that he was free to ignore the police and walk away. Applying that objective standard, we consider the circumstances presented here. *See J.M., supra*, 619 A.2d at 500.

In this case, two officers approached Jackson with their guns visible. Officer Allen stood in front, and the other officer stood behind him as they faced Jackson, whose back was to a building. During the encounter, Officer Allen was about a foot away from Jackson, with enough space between them for a person to pass. Officer Allen asked Jackson whether he had any drugs, and Jackson said that he did not. The officer then asked him to raise his jacket, and Jackson complied. The officer continued to question Jackson, inquiring about how long Jackson had been there, whether he lived in the neighborhood, whether he was visiting anyone, and the name of the person he was visiting. Jackson responded to each of these questions. The officer became suspicious when Jackson said he was there to see an Adrian Thomas, and the officer knew only an Adrian Mosbray, who was reported to be involved in drug activity, at the address to which Jackson pointed. The officer then decided to frisk Jackson and asked him, "please turn around for me." Officer Allen testified that as Jackson began to turn, "my hand hit the right side of his pocket and kind of like gripped it and I felt a gun."[8] On this factual basis, we must decide whether a reasonable person would have been warranted in believing that he did not have to comply with the officer's request to turn around.[9]

◼ Jackson argues that no reasonable person would have felt free to decline the police officer's request or to terminate the encounter. In any event, Jackson contends, the encounter lost any consensual character when Officer Allen asked him to raise his jacket or at least when the officer asked him to turn around, intending to pat him down for weapons. Among the factors which may indicate whether a seizure has occurred are " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Kelly, supra*, 580 A.2d at 1286 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). These factors must be considered as a whole, under the totality of the circumstances, rather than in isolation. *See id.* at 1285 (citing *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870). In this case, the officer's language and tone were polite during the encounter. However, an officer's "questioning [does] not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere...." *Guadalupe, supra*, 585 A.2d at 1361. The totality of the circumstances may be sufficiently intimidating to indicate to a reasonable person that he is not free to ignore the officer and go on his way. *See id.*

◼ Here, there were two officers standing in front of Jackson who had weapons in view, even though holstered.

---

8. In the *Gerstein* affidavit, Officer Allen swore that he discovered the gun when he "patted down [Jackson's] right front pocket." *See Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

9. A reasonable person, of course, presupposes a reasonable innocent person. *Bostick, supra*, 501 U.S. at 438, 111 S.Ct. 2382.

Even assuming that Jackson's initial compliance with Officer Allen's request to raise his jacket was consensual, the fact that the officer remained unsatisfied and continued to question Jackson adds to the circumstances that would convey to a reasonable innocent person that he was not going to be permitted to leave until the officer was satisfied with his answers or found what he was looking for. *See Hawkins, supra,* 663 A.2d at 1228. In *Hawkins,* the court held that an unlawful seizure occurred where a police officer repeatedly questioned Hawkins about whether he possessed a weapon after he had twice assured them that he did not.[10] *Id.* As pointed out in the concurring opinion concerning the impact of the officer's repeated requests,

> [a]t this point, I cannot conceive that a reasonable person would not have understood the question as accusatory and that his freedom to " 'go about his business,' " ... depended on giving satisfactory assurance to the officers that he was not carrying a gun. I attach no importance to the fact that appellant immediately simulated such assurance by displaying his money as "all he had" on his person; the point, rather, is that a reasonable (innocent) person in the circumstances would have felt constrained to offer similar proof as the price of being allowed to go on his way. In short, he would have been seized for the time necessary to give that assurance.

*Hawkins,* 663 A.2d at 1230 (Farrell, J. concurring) (footnotes and citations omitted).[11] *See also Guadalupe, supra,* 585 A.2d at 1362 (a person confronted for a second time to allow a body search after allowing a baggage search, would not have felt free to leave, and absent articulable suspicion of criminal wrongdoing, an unlawful seizure occurred).

Similarly, in the present case, we conclude that given the totality of the circumstances, by the time Jackson was asked to turn around (apparently in preparation for a frisk), and the officer touched Jackson's jacket, the police crossed the "critical line between consent and coercion." *See Hawkins,* 663 A.2d at 1230. Given the sequence of events that preceded the officer's request that Jackson turn around so that his back was to the officer, the reasonable expectation would be that a pat down or frisk would ensue. These circumstances surely would not convey to a reasonable person that he could disobey the officer at that point and terminate the encounter. This is especially true if, as our precedents direct, we take an "earthy" and realistic approach to such street encounters. *Cooper v. United States,* 368 A.2d 554, 557 (D.C.1977). Therefore, the seizure can be justified here only if the police had " 'some particularized and objective justification' for the seizure." *Barnes, supra,* 496 A.2d at 1042 (quoting *Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. 1870).

To justify a *Terry* stop, the police " 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Peay v. United States,* 597 A.2d 1318, 1320–21 (D.C.1991) (en banc) (quoting *Terry, supra,* 392 U.S. at 21, 88 S.Ct. 1868). "The requirement of 'articulable suspicion' is not an onerous one." *Gomez v. United*

---

**10.** Hawkins' car had been double parked when two officers stopped him, and one directed him to park the car and turn off the ignition. *Hawkins, supra,* 663 A.2d at 1226.

**11.** Judge Mack, in her opinion, agreed with Judge Farrell "that the repeated questioning about the possession of a weapon resulted in a seizure in violation of the Fourth Amendment." *Hawkins, supra,* 663 A.2d at 1228.

*States,* 597 A.2d 884, 888 (D.C.1991). Various factors are considered in determining whether a *Terry* stop is justified, including "the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Anderson v. United States,* 658 A.2d 1036, 1038 (D.C.1995) (citing *Adams v. Williams,* 407 U.S. 143, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (other citations omitted)). The government's argument in support of the validity of the stop and frisk is premised upon the inclusion among the pertinent factors of Officer Allen's inadvertent touching of a hard object on Jackson. Thus, the government argues that "Officer Allen must have had a reasonable and articulable suspicion that appellant *may* have been armed and dangerous in order for his willful squeeze (and consequent seizure of appellant's person) to have been lawful under the Fourth Amendment" before the "willful squeeze." We have concluded that the seizure occurred earlier, and therefore, we turn to consideration of whether the police conduct was justified based on the presence of reasonable grounds to believe that criminal activity was afoot and that the officer was dealing with an armed and dangerous individual. *See Terry, supra,* 392 U.S. at 27, 29–30, 88 S.Ct. 1868.

In addition to the hard object which the officer felt, the government points to the reliable elderly citizen's report that a man had been standing in front of her walkway acting as a lookout; that this was a drug area where there had been shootings sometimes in the past week; that Jackson, who matched the caller's description, was there when the officer arrived about an hour or more after the citizen's call; that Jackson did not live in the area; that Jackson said he was waiting for an Adrian Thomas who lived at a nearby address; and that the officer knew of only one Adrian (not Thomas) who frequented the address and who was involved in drug activity. Examining these facts individually and collectively, we conclude that this information falls short of that required for reasonable articulable suspicion. First, there was no report of criminal activity in the area on the day of Jackson's arrest. While the caller mentioned that Jackson might be a "lookout," she reported no crime, and the officers did not observe any criminal activity when they arrived at the scene. The absence of a report of criminal activity at all on the day that the police encountered Jackson, particularly when coupled with the fact that no association was made between Jackson and the earlier shootings and drug activity in the neighborhood, dispels the notion that there is a basis to conclude that criminal activity was afoot. *See Green v. United States,* 662 A.2d 1388, 1391 (D.C. 1995);[12] *see also Anderson, supra,* 658

---

12. In *Green, supra,* the police officers were in the 3200 block of Wheeler Road, S.E., to investigate reports of gunfire, and they stopped several persons in front of an apartment building. *Id.* at 1389. While doing so, one of the officers saw Green about to come out of the building, but Green placed something in his pocket and retreated back into the building when he saw what was transpiring. *Green,* 662 A.2d at 1389. The officer followed Green and stopped in the basement, where he found him "peeping around the corner." *Id.*

The officer brought Green out of the building, frisked him, and found a pistol. *Id.* This court reversed the denial of Green's motion to suppress the pistol. *Id.* at 1392. In so holding, the court observed that the officer had not observed any criminal activity and had not identified a potential weapon. *Id.* at 1391. Further, noting that the mere fact that a person looks to see whether the police have left, without more, cannot be construed as consciousness of guilt sufficient to warrant a *Terry* stop. *Id.*

A.2d at 1039; *Duhart, supra,* 589 A.2d at 899. Second, the fact that a person is in an area known for narcotics traffic and even shootings is insufficient, without more, to buttress the conclusion that a *Terry* stop is warranted. *Duhart,* 589 A.2d at 899–900. While it is a factor which can be considered, " '[t]his familiar talismanic litany, without a great deal more, cannot support an inference that [a person] was engaged in criminal conduct.' " *Id.* (quoting *In re D.J.,* 532 A.2d 138, 143 (D.C.1987)) (quoting *Curtis v. United States,* 349 A.2d 469, 472 (D.C.1975)). Third, Jackson's explanation that he was waiting for someone named Adrian, even with the officer's suspicion that it was the same person about whom he had reports of involvement with drug activity, is insufficient to conclude that Jackson was also engaged in some type of criminal activity. We have rejected the notion that mere association with a known criminal will provide articulable suspicion for a *Terry* stop. *See Smith, supra,* 558 A.2d at 315.[13]

For the foregoing reasons, we conclude that the circumstances did not justify a *Terry* stop and frisk. Therefore, we

*Reverse and remand.*

---

13. In *Smith, supra,* this court held that the police did not have sufficient grounds for a *Terry* stop where

(1) appellant was engaged in a conversation with two men who less than two minutes before had been the subjects of a radio run for a narcotics transaction; (2) no other persons were in the immediate area; (3) the experienced police officer was aware that narcotic sales are often made by several persons working as a team; (4) the neighborhood was a high narcotics trafficking area; and (5) appellant attempted to leave hurriedly when the officers suddenly appeared on the scene.

558 A.2d at 314.