*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-509

EDWARD TOWLES, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-19611-13)

(Hon. Robert I. Richter, Trial Judge)

(Submitted January 6, 2015                    Decided June 4, 2015)

*Barbara E. Kittay* was on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Kamliah House*, *Elana Suttenberg*, and *L. Jackson Thomas II*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and KING, *Senior Judge*.

THOMPSON, *Associate Judge*:  After the trial court denied his motion to suppress and after a stipulated trial, appellant Edward Towles was convicted of unlawful possession of liquid phencyclidine ("PCP"), carrying a pistol without a license, unlawful possession of a firearm by a felon, possession of an unregistered

firearm, and unlawful possession of ammunition. He argues on appeal that the trial court (1) erred in denying his motion to suppress and (2) unlawfully imposed a three-year minimum sentence after ruling that his prior involuntary manslaughter conviction was a "crime of violence" for purposes of D.C. Code § 22-4503 (b) (1) (2012 Repl. & 2013 Supp.). For the reasons that follow, we affirm.

## I.

At the hearing on the motion to suppress, Jordan Katz, six-year veteran of the Metropolitan Police Department ("MPD") gun recovery unit, testified that he, two other MPD officers, and an Alcohol, Tobacco and Firearms ("ATF") agent, all armed, were driving in an unmarked car with its windows down on the evening of November 6, 2013, near the intersection of Howard Road and Bryan Place, S.E. All the officers were wearing vests with the word "Police" across the front and back, in letters that could be read by someone standing outside the car. The officers and ATF agent were looking for guns but were not acting on any citizen call or informant tip at that time. Officer Katz testified that the gun recovery unit had "recovered a lot of guns over the years" in the area and that he personally had arrested "probably over ten" people with guns in the three or four blocks near Bryan Place, including a "handful" of people "in the last few months."

Officer Katz, who was sitting in the front passenger seat, saw appellant walking with another man. Appellant was wearing a "bulky" green coat or jacket, and his hand was in his right pocket. As the officers' vehicle got closer to the two men, Officer Katz saw appellant look over his right shoulder at the officers' vehicle. Appellant then turned his head away, took his right hand out of the coat pocket, and put his hand "under his coat toward his right waistband" and "just moved it around." Appellant then "cut[] behind" his companion and moved away from him, turning onto Bryan Place (which runs for only one block) and walking "much quicker" than he had been when Officer Katz first saw him. Officer Leo, who was driving, turned the police vehicle onto Bryan Place in order to follow appellant, and appellant "kept looking back at" the police vehicle as he walked toward a fence. Officer Katz asked Officer Leo to stop the car, and Officer Katz and ATF Agent Srivastava both got out of the vehicle.[1]

Officer Katz began "side stepping" toward appellant and asked him, in a "normal" tone of voice, whether he had a gun on his right side. Officer Katz testified that he asked this question because of appellant's gestures: taking his hand

_____

[1] Agent Srivastava moved toward Howard Road, about 18 feet away, closer to the man who had been walking with appellant.

out of the pocket, making a movement at his right waistband (movement that Officer Katz testified caused him to be concerned that appellant had a gun in his waistband), breaking away from his friend, and "[e]specially when he went towards that fence[,]" a movement that caused Officer Katz to think, "he's going to take [a gun] out and put it on the fence."[2]  In response to Officer Katz's question, appellant "took his hand [and] kind of reached it under his coat[,]" and Officer Katz saw a cell phone clipped to appellant's belt.  Appellant unclipped the cell phone, held it so that Officer Katz could see it, and said, "[I]t's just a cell phone."  As appellant did so, "the right coat pocket of [appellant's] coat hung over his right hand" such that Officer Katz "could see that there was something heavy" in the pocket.  Officer Katz thought this heavy object was a gun.[3]

At that point, Officer Katz started to walk slowly toward appellant. Appellant "took his right side and turned it away" as if to keep the officer from seeing it as the officer walked toward him.  Appellant also "started to look side to

---

[2]  Officer Katz testified on cross-examination that appellant's "walking behind" his companion after looking at the officers and "going much quicker in . . . breaking away[,]" and appellant's "action with [his] hand . . . reach[ing] to [his] waistband" made the officer "suspicious."

[3]  Officer Katz identified, and the court admitted, Defense Exhibits 3 and 5, photographs of appellant with the gun in his pocket.

side[,]" as if "looking for a way out of here." Officer Katz, who was standing about 18 to 20 feet from appellant, said to appellant in a "raised" voice, "[H]ey, keep looking at me. Keep looking at me." Officer Katz explained that he said this because "at this point[,] with everything I'd seen, I figured he probably had a gun" and "[w]hen he started to look side to side, I'm also thinking he's about to run [and] I would like him not to run" or to "try to take the gun and just throw it or take it out [or] do something else."[4] Officer Katz testified that he next said to appellant, in a conversational tone, "[C]an I pat you down, make sure you don't have a gun[?]" Appellant responded, "[Y]eah, okay[,]" and then "just put his head down." Officer Katz walked toward appellant and put his hands out toward appellant's waistband, but, before he could touch appellant, appellant said, "I got a gun." At this point, Officer Katz pushed appellant's arms up, and Officer Olszack, who had just gotten out of the police vehicle, grabbed appellant's left arm while Officer Katz held onto appellant's right arm. At that point, Officer Leo got out of the police vehicle (Officer Katz having given the "code word for a gun"), came over, and, as appellant was starting to say, "it's in my pocket," touched appellant's right coat pocket, where he felt a handgun (later determined to be a small, .32

---

[4] Officer Katz further explained that he did not order appellant to stop, but "want[ed] to keep his focus on me" because "[w]hen you can see someone's focus on you, they might not run away."

caliber semiautomatic weapon).[5]  The officers then handcuffed appellant.  Shortly afterwards, appellant said, "I got some water[,]" (i.e., PCP) and motioned his head down toward a breast pocket of his coat.  Officer Katz touched the pocket and felt a vial.  The crime scene officers later recovered a vial of PCP and a gun from appellant's pockets.  Officer Katz testified that at no point during this encounter did he draw his weapon.

The defense witnesses at the suppression hearing were Richard Carter (appellant's cousin and the man who had been walking with appellant that evening) and appellant himself.  Carter testified that he and appellant were walking in the street down Bryan Place, headed toward the Metro station, when they looked back, saw a car with police in it, and moved out of the way of the car.  As he and appellant kept walking, someone in the car yelled, "[L]ift your shirts up[,]" and "Do you all have a gun?"  Carter and appellant lifted their shirts.  Appellant pulled his cell phone from his side, showed it to the officers, and said he did not have a gun.  Carter and appellant continued walking together, but an officer got out of the car and kept asking whether the two men had guns, and the two repeatedly answered that they did not.  The officer asked whether he could search the men,

---

[5]  The gun measured about three inches "from the bottom of the handle to the top."

and both said again that they did not have guns. That officer and one other walked over to appellant, put his hands up, started searching him, and found a gun on him. Another officer told Carter to put his hands up and empty his pockets, both without his consent. Carter, who said that he was "apart from [appellant] when he was talking to the other officers" but could hear everything the officers were saying, testified that he never heard appellant give consent to a search or a pat down. Carter also acknowledged that only one officer, whose gun was not drawn, was talking to appellant during the beginning of the encounter, before Carter was asked to empty his pockets.

Appellant testified that he and Carter were walking toward the Metro station (on a planned route of going past Howard Road to Bryan Place, to Stanton Road and then Sheridan Road and finally back to Howard Road where the Anacostia station is located) when they were stopped by the police. According to appellant, he looked back and observed a "truck with police officers in it" slow down behind him. He "just kept walking," with his cell phone in his right hand. After appellant and Carter turned onto Bryan Place, appellant clipped his phone to his waistband. He turned around when the police vehicle's "lights shined." Someone yelled, "[D]o you have a gun on your right side[?]" and "Can you lift up your jacket[?]" At the time, appellant testified, Carter was "beside [appellant] but a little bit [not

even a foot] behind." Appellant testified that he turned, lifted his jacket on the side, grabbed his phone, showed it to the officers, and told them it was only a phone. He then continued walking.

At that point, appellant testified, one of the officers got out of the vehicle and said, "[S]top," to appellant. After appellant stopped, the officer repeatedly asked him whether he had a gun on him or whether he had "anything on [him]." The officer then said, twice, "[C]an I search you[?]" Appellant both times shook his head, replied, "[N]o," and said, "I don't have nothing." As the officer then walked up to appellant, appellant "turned [his right side] to the side a little bit" because he wanted the officer to leave him alone. The officer grabbed him, pushed his arms up, put his hands under appellant's armpits, and said, "I'm going to ask you again, do you have anything on you[?]" Appellant testified that, at this point, he admitted to having a gun in his right pocket. The officer "called the code" and other officers "just bum rushed" appellant. Appellant testified that before the officer put his hands on him, he never gave the officer permission to touch him, search him, or pat him down. He would not have done so, he testified, because he knew he was "dirty" and because he was on parole at the time. He agreed that the officer never drew his gun and was the only one talking to him during the incident.

At the close of the suppression-hearing evidence, Judge Richter credited Officer Katz's version of the night's events, explaining:

> [O]bviously I am utterly unable to say with certainty who's telling the truth. . . . As I say, I can't be certain. If this were beyond a reasonable doubt, I could not, on this record, credit Officer Katz's beyond a reasonable doubt. But I will credit him by a preponderance.

Finding that appellant gave his consent to be patted down before there was any seizure or search, and that what occurred "happened in the sequence as [Officer Katz] described[,]" Judge Richter denied the motion to suppress. Appellant thereafter agreed to a stipulated trial and to incorporating the motions hearing as the trial record. Judge Richter found appellant guilty on all counts. At the April 25, 2014, sentencing proceeding, Judge Richter ruled that appellant's previous involuntary manslaughter conviction[6] qualified as a "crime of violence" under D.C. Code § 22-4503 (b) (1) and that the court was therefore required to sentence appellant to a mandatory minimum sentence of three years for the felon-in-possession conviction. This appeal followed.

## II.

---

[6] Appellant had previously pled guilty to involuntary manslaughter in Maryland.

In resolving a challenge to the denial of a motion to suppress, we view the facts and all reasonable inferences therefrom in the light most favorable to the government as the prevailing party, and we review the Superior Court judge's findings of fact only for clear error. *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013). We review *de novo* the judge's determination that no Fourth Amendment violation occurred. *Id.*

The Fourth Amendment to the Constitution protects individuals from unreasonable seizures by police. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968). In general, any restraint of a person amounting to a seizure is invalid unless justified by probable cause. *See Hawkins v. United States*, 663 A.2d 1221, 1225 (D.C. 1995). However, a police officer may conduct an investigatory stop on less than probable cause provided that, "given the totality of the circumstances . . . the . . . officer could reasonably believe that criminal activity was afoot." *Duhart v. United States*, 589 A.2d 895, 897 (D.C. 1991) (citing *Terry*, 392 U.S. at 29-30). "A seizure does not occur simply because a law enforcement officer approaches a person on the street and asks him or her questions; the officer may engage in such encounters without violating the Fourth Amendment if the person approached is willing to listen and answer questions." *Jackson v. United States*, 805 A.2d 979,

984 (D.C. 2002) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).  The "crucial test for determining whether a person has been seized is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *In re J.F.*, 19 A.3d 304, 308 (D.C. 2011) (quoting *In re J.M.*, 619 A.2d 497, 499-500 (D.C. 1992)) (internal quotation marks omitted).  There are a number of factors that can indicate that a seizure has occurred, including, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

An encounter between a police officer and an individual may begin consensually and then, because of the officer's show of authority or some other indication that the individual is not free to leave, become a nonconsensual seizure, which would then require reasonable, articulable suspicion to pass constitutional scrutiny.  *See Reyes v. United States*, 758 A.2d 35, 38 n.2 (D.C. 2000); *Terry*, 392 U.S. at 21-22; *see also Florida v. Royer*, 460 U.S. 491, 498 (1983) (stating that an individual "may not be detained even momentarily without reasonable, objective

grounds for doing so"). "Consent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact sufficiently an act of free will to purge the primary taint of the unlawful seizure." *Hicks v. United States*, 705 A.2d 636, 641 (D.C. 1997) (internal quotation marks omitted).

## III.

Appellant advances the following claims: that Judge Richter erroneously denied the motion to suppress; that appellant "terminated the encounter by continuing on his way" after police first asked whether he had a gun and he responded by showing his cell phone; that the officers continued with "questions and demands [that] would not stop until [appellant] demonstrated complete submission"; that any consent he gave to a search came only after the officers had "repeatedly demanded permission to search," thereby effecting an illegal stop and seizure; that the police encounter (which appellant characterizes as a "prolonged and unreasonable detention") "should have ended, long before any such alleged consent"; and that "the police were not entitled to extend the duration of the encounter to obtain the alleged consent." However, appellant is able to make these arguments only by relying on his and Carter's hearing testimony instead of on

Officer Katz's credited testimony.[7]  Appellant emphasizes Judge Richter's "utter[] [inability] to say with certainty who's telling the truth," argues that Judge Richter "strained to find [Officer Katz's testimony] credible," asks us to consider "how reluctantly the trial court credited the officer's testimony over that of appellant and his cousin," and makes the troubling suggestion that Judge Richter's credibility determination was driven by the judge's being "most reluctant to denigrate [Officer Katz's] credibility[.]"

We therefore begin our analysis by considering appellant's (implicit) suggestion that this is one of those rare cases in which we should not defer to the trial court's credibility determination.  Judge Richter found that Officer Katz was "a very credible sounding witness" who had "a reason to remember the details" and who was "more credible" than appellant and Carter.  In crediting Officer Katz's testimony over that of the defense witnesses, Judge Richter acknowledged defense counsel's "very logical" argument that it was "farfetched that someone who had contraband on them would consent to a search."  The judge observed, however, that "everyday [sic] I see cases in here where people consent to a search

---

[7]  For example, appellant asserts — contrary to Officer Katz's credited testimony that the officer "never said anything out the window" — that "[f]rom inside the police car, Officer Katz shouted to the two men . . . , asking whether they were carrying guns, and demanding to see under their jackets."

[and it's] not even contested that they consent[ed]."[8]  In assessing Officer Katz's credibility, Judge Richter also explained that it "b[ore] on the credibility of Katz's version" that the officer's "statement that [appellant's jacket] pocket looked like it had something heavy in it" was "supported by [exhibit] number 5" (the photo of appellant with the gun in his right jacket pocket).  Looking at the photo, Judge Richter observed, "[T]here's certainly something in there. . . . [T]he picture clearly reflects that there's something there."  The judge further remarked that Officer Katz's testimony that the object in the pocket "appeared to have some weight" was "not in any way incredible"; that "even the teeny tiny gun that [appellant] described would show the weight in the pocket[]"; that the photo depicted something of a "size . . . consistent with a gun" (though "hardly an outline of a gun"); and that the "something there" or "weighted object" in the pocket would have been more visible "in real life" than in the still photo.[9]  In light of Judge

_____

[8]    Judge Richter reasoned that appellant's agreeing to a pat down "could have been a bluff" or "might have [reflected] a sense that [a pat down] was going to happen anyway."  We also note that Officer Katz's credited testimony included his answer (given in response to defense counsel's question about whether, on a regular basis, people refuse to consent to being searched), "You know what, rarely. It doesn't happen that often to be honest[.]"

[9]    Judge Richter was not persuaded by defense counsel's argument that Officer Katz — the same officer who was found in *Robinson v. United States*, 76 A.3d at 331, to have violated the defendant's Fourth Amendment rights when he frisked him without reasonable articulable suspicion — gave testimony that reflected the officer's new *modus operandi* of claiming that he had obtained

(continued…)

Richter's foregoing reasoning, we cannot agree that he "strained" to find Officer Katz credible.[10]

Appellant highlights Judge Richter's statement that "if a judge finds a police officer incredible these days, if I were to make that finding, there's a big price to pay. He's almost useless to the police department thereafter." Appellant appears to imply that the judge thereby revealed that, for policy reasons, he was crediting the police officer's testimony over that of the lay witnesses — an approach that would have amounted to accepting the police officer's testimony simply because

_____

(…continued)

consent to a search. Judge Richter also rejected appellant's argument that Officer Katz's testimony was inconsistent with the statements he wrote in his *Gerstein* affidavit.

[10] Judge Richter did explain that, in his estimation, the witness(es) on both sides had motives to lie. He observed that appellant was "facing [a] certain lengthy jail term if it's found that he did not consent" and thus had "a rather potent motive to say he didn't consent." Carter, Judge Richter observed, "may or may not have been in a position to hear . . . what everybody was saying" and also had "a motive to try to protect his cousin and close friend." At the same time, Judge Richter acknowledged that it was "more than theoretically possible that [Officer Katz] could be out there searching people and then later saying they consented even though they didn't." He observed that Officer Katz's "motive[s] to lie would be [that] he wants to make as many cases as he can[,] has to protect himself and avoid being found to have acted illegally"; "doesn't want to get in trouble"; and "wants to get guns off the street either for his own purposes or for the community purposes." On balance, however, reasoning that these were the officer's "only" motive to lie, Judge Richter concluded that the officer had "less motive to lie" and was "more credible."

he is a police officer. Such an approach, of course, is contrary to the standard instruction given to jurors when they are the fact-finders, an instruction that applies equally to trial judges: "In no event should you give either greater or lesser weight to the testimony of any witness merely because s/he is a police officer."[11] A close reading of the transcript makes us confident, however, that Judge Richter's statement did not signal an abdication of his duty to make a genuine credibility determination, one unaffected by consideration of factors such as the police department's needs. Judge Richter made the statement in question in response to defense counsel's assertion that there is no "downside" for a police officer who testifies untruthfully, because officers are rarely prosecuted for perjury. We read Judge Richter's statement as a demurrer that, while the risk of any witness's being prosecuted for perjury is "close to zero" and "the risk of [an officer] being caught . . . lying is probably not tremendous[,]" there nevertheless *is* a downside and thus a deterrent for an officer who lies on the stand: the risk of being rendered "useless" to the MPD and thus of jeopardizing the officer's continued employment as an officer. We discern nothing improper about Judge Richter's statement and no reason not to defer to his credibility determination.

---

[11] Criminal Jury Instructions for the District of Columbia, No. 2.207 (5th ed. rev. 2013).

Deferring to Judge Richter's credibility-based findings, we cannot accept appellant's premise that he "terminated the encounter by continuing on his way" after Officer Katz first asked whether he had a gun and he responded by showing his cell phone; that Officer Katz continued with "questions and demands [that] would not stop until [appellant] demonstrated complete submission"; that any consent appellant gave to a search came only after the officers had "repeatedly demanded permission to search," thereby effecting an illegal stop and seizure; and that the police encounter "should have ended, long before [the] alleged consent." Judge Richter acknowledged that if — as appellant asserts on appeal — Officer Katz had "many times" asked appellant "do you have a gun," that behavior "could rise to a point of seizure." However, Judge Richter credited Officer Katz's testimony that "there was not [such] repeated haranguing[.]" and found that what occurred "happened in the sequence as [Officer Katz] described."

Conducting our *de novo* review, we are satisfied that the encounter between Officer Katz and appellant had not evolved into a stop or seizure either at the point when Officer Katz asked appellant, in a "normal" tone of voice, whether he had a gun on his right side and appellant showed the officer the cell phone that had been clipped to his waistband; or before Officer Katz saw something heavy (that the

officer had good reason to believe was not a cell phone)[12] in appellant's right jacket pocket; or before appellant acted as if he was trying to hide something from the officer when he "blad[ed]" his right side away as the officer approached him.[13] Accordingly, Officer Katz's immediately subsequent act of asking appellant whether he could pat him down to make sure he did not have a gun[14] did not

---

[12]    Officer Katz testified that "[a] lot of times when you see that[, i.e., something heavy in a pocket,] it's a cellphone [but I was] looking at him holding a cell phone."

[13]    *Cf. Brown v. United States*, 983 A.2d 1023, 1025 (D.C. 2009) (holding that there was no seizure where a police officer walked up to the defendant, spoke in a normal tone, did not place her hand on her gun, did not make any threatening gestures, and asked, "Do you have any guns, drugs, or narcotics on you?"; the defendant replied, "I'm not doing anything. I'm counting my money"; the officer repeated her question; and the defendant responded by reaching into her purse and handing the officer a brown pill bottle).

[14]    At what appears to have been the contemporaneous point when Officer Katz, using a raised voice, told appellant, "[K]eep looking at me. Keep looking at me[,]" there may have been a seizure because, at least arguably, a reasonable person would have understood from the officer's emphatic directions that he was not free to turn away, "ignore the police presence[,] and go about his business."[14] *Brendlin v. California*, 551 U.S. 249, 261 (2007); *cf. In re J.F.*, 19 A.3d at 306-11 (concluding that when officers stopped a young man and his companion, asked the young man a series of questions, and gave him a direct order to remove his hands from his pockets before asking him if he was willing to be searched, there was a seizure). We do not decide the point, however, because neither in his motion to suppress, nor in the argument before Judge Richter, nor in his brief to this court, did appellant argue that appellant was seized for Fourth Amendment purposes when Officer Katz uttered those commands. We also do not decide whether, by the time Officer Katz uttered those commands, he had reasonable articulable suspicion that appellant was armed. The government so argued in its written opposition to appellant's motion to suppress physical evidence, but the prosecutor

(continued…)

amount to prolonging appellant's "detention." When appellant then said "[Y]eah, okay[,]" and further acknowledged having a gun and told the officer that he had PCP, those further statements gave the officers probable cause to arrest him and to search him incident to arrest. Therefore, the court did not err in denying the motion to suppress.

**IV.**

Appellant additionally contends that the trial court erred when it determined that his 2010 Maryland involuntary-manslaughter conviction was a "crime of violence" for purposes of D.C. Code § 22-4503 (b) (1), a determination that increased the mandatory minimum penalty for his possession charge from one year to three years.[15] Appellant argues that, unlike a previous conviction of voluntary

---

(…continued)
did not make this argument to Judge Richter, did not disagree when Judge Richter observed, "[Y]ou're not arguing that . . . everything that was described r[o]se to the level of articulable suspicion[,]" and did not object when Judge Richter said, "I don't think at any point [the officer's suspicion] rose to the level of an articulable suspicion under *Terry*[,]" and the government also did not make this argument in its brief to this court.

[15] Section 22-4503 (b) (1) provides that "[a] person who violates subsection (a) (1) of this section [by being a felon in possession] shall be sentenced to imprisonment for not more than 10 years and shall be sentenced to imprisonment for a mandatory-minimum term of 1 year, *unless she or he has a prior conviction*

(continued…)

manslaughter, a previous conviction of involuntary manslaughter does not support a sentencing enhancement under § 22-4503.[16] We disagree.

D.C. Code § 22-4501 (1) (2012 Repl.) provides that "[f]or the purposes of this chapter [including § 22-4503], the term[] '[c]rime of violence' shall have the same meaning as provided in § 23-1331 (4)."  In turn, D.C. Code § 23-1331 (4) states:

---

(…continued)

*for a crime of violence* other than conspiracy, in which case she or he shall be sentenced to imprisonment for not more than 15 years and shall be sentenced to a mandatory-minimum term of 3 years" (emphasis added).

[16]  We explained in *Comber v. United States*, 584 A.2d 26 (D.C. 1990), that:

> [V]oluntary manslaughter is a killing committed with an intent to kill or do serious bodily injury, or with a conscious disregard of an extreme risk of death or serious bodily injury, where the presence of mitigating factors precludes a determination that the killing was malicious. . . . In contrast, where a killing is not committed with a specific intent to kill or do serious bodily injury, or in conscious disregard of an extreme risk of death or serious bodily injury, there is no question that the killing was without malice.  However, even such an unintentional or accidental killing is unlawful, and thus constitutes involuntary manslaughter, unless it is justifiable or excusable.

*Id.* at 47-48 (citation omitted).

> The term "crime of violence" means aggravated assault; act of terrorism; arson; assault on a police officer (felony); assault with a dangerous weapon; assault with intent to kill, commit first degree sexual abuse, commit second degree sexual abuse, or commit child sexual abuse; assault with significant bodily injury; assault with intent to commit any other offense; burglary; carjacking; armed carjacking; child sexual abuse; cruelty to children in the first degree; extortion or blackmail accompanied by threats of violence; gang recruitment, participation, or retention by the use or threatened use of force, coercion, or intimidation; kidnapping; malicious disfigurement; *manslaughter*; manufacture or possession of a weapon of mass destruction; mayhem; murder; robbery; sexual abuse in the first, second, or third degrees; use, dissemination, or detonation of a weapon of mass destruction; or an attempt, solicitation, or conspiracy to commit any of the foregoing offenses.

D.C. Code § 23-1331 (4) (2012 Repl. & 2013 Supp.) (emphasis added).

As originally enacted in 1932, the provision now codified as D.C. Code § 22-4501 (previously codified as D.C. Code § 22-3201) contained its own definition of "crime of violence," which included "[m]urder, *manslaughter*, rape, mayhem, maliciously disfiguring another, abduction, kidnapping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary" (emphasis added). Act of July 8, 1932, 47 Stat. 650, § 1 (1932). D.C. Code § 22-3201 was amended multiple times in the decades after its original enactment through the addition of various other offenses deemed

to be "crimes of violence," but the term "manslaughter" — unmodified by any adjective — remained on the list. In *Morris v. United States*, 648 A.2d 958, 959 (D.C. 1994), this court squarely addressed whether "manslaughter" as included in § 22-3201 included involuntary manslaughter and held that it did. Morris had argued that Congress, in drafting the provision, could not have intended for "manslaughter" to include involuntary manslaughter; more specifically, he argued that Congress "could not have intended to enhance punishment for conduct involving risks of which a defendant was [un]aware." *Id.* at 960 (internal quotation marks omitted). We disagreed, reasoning that "Congress, presumptively aware of the common-law bifurcated definition of manslaughter in the District of Columbia, nonetheless wrote no such distinction into the enhancement statute, instead employing the unitary term 'manslaughter.'" *Id.* at 960 (citation omitted).

Meanwhile, in 1970, Congress added another definition of "crime of violence" to the D.C. Code, in a subchapter pertaining to "Release and Pretrial Detention." Act of July 29, 1970, Pub. L. 91-358, § 210 (a), 84 Stat. 642-43, 650 (1970). That definition, codified as the original § 23-1331 (4), included within the term "crime of violence" the following offenses:

> murder, forcible rape, carnal knowledge of a female under the age of sixteen, taking or attempting to take immoral, improper, or indecent liberties with a child

> under the age of sixteen years, mayhem, kidnapping, robbery, burglary, *voluntary manslaughter*, extortion or blackmail accompanied by threats of violence, arson, assault with intent to commit any offense, assault with a dangerous weapon, or an attempt or conspiracy to commit any of the forgoing offenses[.]

§ 210 (a), 84 Stat. at 650 (emphasis added) (quoted in *United States v. Edwards*, 430 A.2d 1321, 1364-65 (D.C. 1981)).  The original § 23-1331 definition also went through several amendments, but its reference to only "*voluntary* manslaughter" remained in all its iterations until 2006.

In 2006, the Council of the District of Columbia passed the Omnibus Public Safety Amendment Act of 2006 (the "2006 Act").  The 2006 Act shortened § 22-4501 (a) to the modern language that directs the reader to § 23-1331 (4).  The 2006 Act also modified § 23-1331 (4), in effect blending the definitions of "crime of violence" that had been included in former sections 22-4501 (a) and 23-1331 (4). *See* Omnibus Public Safety Amendment Act of 2006, D.C. Laws 16-306 (Act 16-482), §§ 223, 224 (Oct. 17, 2006).  This new (and now current) version of § 23-1331 (4) dropped the term "involuntary manslaughter," which had been part of § 23-1331's definition of "crime of violence" since 1970, and replaced it with the term "manslaughter." *Id*. § 224.

Appellant is correct that because *Morris* interpreted a different provision (§ 22-3201), it does not resolve the issue of whether the definition of "crime of violence" contained in the current § 23-1331 (4) and incorporated by reference into the current § 22-4501 includes both voluntary and involuntary manslaughter. However, for the following reasons, we are not persuaded by appellant's argument that the 2006 Act "caused an unintentional omission of the word 'voluntary'" when it amended § 23-1331 (4).

The Council chose to incorporate elements from both the old § 22-4501 (f) and the old § 23-1331 (4) in order to create the new § 23-1331 (4). Seeking to "harmonize" the two provisions,[17] the Council included almost the entirety of the old § 22-4501 (including the unmodified term "manslaughter") into the new definition of "crime of violence," excluding only the crimes of "abduction" and "housebreaking." *Compare* D.C. Code § 23-1331 (4) (2012 Repl. & 2013 Supp.) *with* D.C. Code § 22-4501 (f) (2001). The Council also picked up and incorporated into the new § 23-1331 (4) terms that had been used only in the former § 23-1331 (4), including "carjacking," "cruelty to children in the first degree," "sexual abuse in the . . . third degree[]," and "an attempt, solicitation, or conspiracy to commit any of the foregoing offenses." *Compare* D.C. Code § 23-

---

[17] D.C. Council, Report on Bill 16-247 at 19 (Apr. 28, 2006).

1331 (4) (2012 Repl. & 2013 Supp.) *with* D.C. Code § 23-2331 (4) (2001 & 2004 Supp.). The 2006 Act also added the crimes of "gang recruitment, participation, or retention by the use or threatened use of force, coercion, or intimidation," which had not been in either previous definition of "crime of violence." Omnibus Public Safety Amendment Act of 2006, § 224.

The Council appears to have acted quite deliberately in choosing which elements of the prior definitions to retain; it showed itself quite capable of selecting the term "voluntary manslaughter" from the old § 23-1331 rather than the term "manslaughter" from the old § 22-4501 if that had been what it intended. The backdrop for the 2006 Act was the 1993 decision in *Morris*,[18] and the Council chose to use the term that, for over a decade prior to this amendment, had been interpreted to refer to *both* voluntary and involuntary manslaughter.

"Our primary goal [in statutory construction] is to ascertain and give effect to the intent of the legislative body that drafted the language." *Owens v. United States*, 90 A.3d 1118, 1121 (D.C. 2014) (quoting *Tenley & Cleveland Park*

---

[18] "Ordinarily, [the Council] may be presumed to know the construction which has been given to prior statutory provisions, and to know their history, when it incorporates them into later legislation." *Smith v. United States*, 597 A.2d 377, 382 n.11 (D.C. 1991) (quoting *Office of People's Counsel v. Public Serv. Comm'n*, 477 A.2d 1079, 1091 (D.C. 1984)).

*Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment*, 550 A.2d 331, 334 n.10 (D.C. 1988)). Here, we are bound by that statutory intent as indicated by the plain language of § 23-1331 (4), given that we cannot say that interpreting the term "manslaughter" to include both voluntary and involuntary manslaughter "produces absurd results[,]" "leads to an obvious injustice[,]" or undermines "the legislative purpose of the statute as a whole." *Dobyns v. United States*, 30 A.3d 155, 159 (D.C. 2011) (internal quotation marks omitted). We therefore agree with the trial court's interpretation that involuntary manslaughter is a "crime of violence" under § 23-1331 (4) and for purposes of § 22-4503 (b) (1), and we reject appellant's argument that Judge Richter erred in imposing a mandatory minimum sentence of three years because of appellant's prior involuntary manslaughter conviction.

For the foregoing reasons, the judgment of the trial court is

*Affirmed*.